COMMONWEALTH of Pennsylvania,
Appellee

v.

Stephen H. STETLER, Appellant.

Superior Court of Pennsylvania.

Argued April 1, 2014.
Filed June 3, 2014.
Reargument Denied Aug. 18, 2014.

Barbara A. Zemlock, Harrisburg, for appellant.

Amy Zapp, Office of Attorney General, Harrisburg, for Commonwealth, appellee.

BEFORE: DONOHUE, ALLEN, and STABILE, JJ.

OPINION BY ALLEN, J.:

Stephen H. Stetler ("Appellant") appeals from the judgment of sentence imposed after a jury convicted him of conflict of interest, four counts of theft, and one count of conspiracy.[1] We affirm.

Appellant's convictions were based on allegations of misconduct during his service as a state legislator. On September 25, 2012, the trial court sentenced Appellant to an aggregate term of eighteen (18) to sixty (60) months of imprisonment. In addition, the trial court ordered Appellant to pay $466,621.45 in restitution.[2] This

---

1. 65 Pa.C.S.A. § 1103, and 18 Pa.C.S.A. §§ 3921, 3926, 3922, 3927, and 903, respectively.

2. On October 9, 2012, the trial court issued an amended sentencing order, which changed Appellant's sentence at count 2 to not less than fourteen (14) nor more than forty-eight (48) months, less one day. All other aspects of the sentence remained unchanged.

timely appeal followed. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant raises the following issues:

A. WHERE THE TRIAL COURT MET WITH THE JURY OUTSIDE OF THE PRESENCE OF [APPELLANT] AND COUNSEL AND ANSWERED QUESTIONS WHICH PERTAINED TO THE COURT'S CHARGE AND ELEMENTS OF THE OFFENSE, WAS [APPELLANT] DEPRIVED OF HIS RIGHT TO COUNSEL AND TO A FAIR TRIAL IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE [1], SECTION 9 OF THE CONSTITUTION OF THE COMMONWEALTH, AS WELL AS PA.R.CRIM.P. 647(C)?

B. WHETHER THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT [APPELLANT] WAS GUILTY OF ENGAGING IN A "CONFLICT OF INTEREST?"

C. WHETHER THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT [APPELLANT] WAS GUILTY OF THEFT BY UNLAWFUL TAKING OR DISPOSITION?

D. WHETHER THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT [APPELLANT] WAS GUILTY OF THEFT OF SERVICES?

E. WHETHER THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT [APPELLANT] WAS GUILTY OF THEFT BY DECEPTION?

F. WHETHER THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT [APPELLANT] WAS GUILTY OF THEFT BY FAILURE TO MAKE REQUIRED DISPOSITION OF FUNDS?

G. WHETHER THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT [APPELLANT] WAS GUILTY OF CONSPIRACY?

H. WHERE THE TRIAL COURT PERMITTED A CHART WHICH WAS NOT ADMITTED INTO EVIDENCE TO BE PROVIDED TO THE JURY IN THE DELIBERATION ROOM, WHETHER SUCH VIOLATED [APPELLANT'S] RIGHT TO DUE PROCESS OF LAW, AS GUARANTEED BY THE CONSTITUTIONS OF THE UNITED STATES AND OF THE COMMONWEALTH OF PENNSYLVANIA, AS WELL AS THE RULES OF CRIMINAL PROCEDURE?

I. WHETHER THE DELIBERATE DESTRUCTION BY [THE PENNSYLVANIA OFFICE OF ATTORNEY GENERAL] OF WITNESS INTERVIEW NOTES AND PROFFER STATEMENTS VIOLATED [APPELLANT'S] RIGHTS UNDER THE CONSTITUTIONS OF THE UNITED STATES AND THE COMMONWEALTH OF PENNSYLVANIA, AS WELL AS PENNSYLVANIA RULE OF CRIMINAL PROCEDURE 573?

J. WHERE: (1) THE [TRIAL] COURT AWARDED RESTITUTION TO AN ENTITY WHICH THE LAW DOES NOT RECOGNIZE AS AN ENTITY TO WHICH RESTITUTION CAN BE AWARDED; AND (2) THE IMPOSITION OF RESTITUTION IN THE AMOUNT OF $466,621.45 IS NOT SUPPORTED BY THE RECORD, WHETHER THE IMPOSITION OF RESTITUTION WAS IMPROPER AND CONTRARY TO LAW?

Appellant's Brief at 3–4.

Unfortunately for the citizens of Pennsylvania, a recent spate of case law involving similar conduct by state legislators,

and involving similar issues raised by Appellant, has evolved. *See, e.g., Commonwealth v. Orie,* 2014 Pa.Super. LEXIS 116, 88 A.3d 983 (Pa.Super.2014); *Commonwealth v. Feese,* 79 A.3d 1101 (Pa.Super.2013); and *Commonwealth v. Habay,* 934 A.2d 732 (Pa.Super.2007).

After careful review, we conclude that the Honorable Todd A. Hoover, sitting as the trial court, has applied the pertinent legal principles of such cases to the detailed facts he references in his Pa.R.A.P. 1925(a) opinion—facts which we need not repeat. Moreover, President Judge Hoover thoroughly discussed each issue raised by Appellant, citing pertinent case law and procedural rules, and correctly rejected each one.

This case is unusual in that the trial court, with the permission of both parties' counsel, acted as a go-between/conduit between the jury and counsel during the jury's deliberations.

■ Regarding Appellant's first issue, we agree with the Commonwealth that Appellant waived this issue because he did not make a specific objection at the time of trial. *See generally,* Pa.R.A.P. 302; *see also* Pa.R.Crim.P. 647(B) (providing that challenges to a trial court's instruction to a jury must be made at the time the allegedly erroneous information was given). In his reply brief, Appellant asserts that he had no basis to question the trial court's veracity during the trial proceedings. Appellant's Reply Brief at 4. However, because "[a]ll interaction between the judge and jury was stenographically recorded," *Commonwealth v. Johnson,* 574 Pa. 5, 828 A.2d 1009, 1013 (2003), Appellant could have raised the matter during trial or in a post-sentence motion. Indeed, after returning from speaking to the jury, Judge Hoover described to counsel what transpired, including informing counsel that the jury had additional questions. *See* N.T., 6/26/12, at 1171–1172.

Our review reveals that the parameters of the information the trial court was to impart to the jury outside the presence of Appellant and his counsel was never established on the record. Moreover, Appellant's citation to parts of the record to advance his claim is a selective and self-serving reading of Judge Hoover's comments to the jury. *See, e.g.,* Appellant's Reply Brief at 3–4; N.T., 6/26/12, at 1174.

We further note that Appellant's reliance upon *Johnson, supra,* is inapposite, since in *Johnson,* no such arrangement existed, and trial counsel specifically requested the defendant be present for any additional instructions on the record. *See Johnson,* 828 A.2d at 1011 (citing trial counsel's statement, "just for the record, we would ask that there not be a charge to the jury, or anything happen without counsel or the client being here").

Although we discern no improprieties in Judge Hoover's instructions to the jury, at no time did Appellant's trial counsel raise any objection. *Compare Johnson,* 828 A.2d at 1015 (explaining that "the performance of counsel is not implicated, for counsel timely objected to the exclusion"). If Appellant now perceives that trial counsel's agreement to this arrangement was ineffective, he may pursue post-conviction relief. At this juncture, however, given trial counsel's acquiescence, we have no basis upon which to grant Appellant relief.

Based on the foregoing, and relative to all of Appellant's issues, we adopt President Judge Hoover's comprehensive and well-reasoned August 14, 2013 opinion in disposing of this appeal. The parties shall attach a copy of the opinion in the event of future proceedings.

Judgment of sentence affirmed.

## TRIAL COURT OPINION

On June 27, 2012, a jury found Stephen Stetler ("Defendant") guilty of six felony offenses based upon allegations of misappropriation of taxpayer-funded resources during the years 2004 through 2006. On September 25, 2012, the court sentenced Defendant to an aggregate term of imprisonment of 18 to 60 months as follows:

Count 1, Conflict of Interest, 65 Pa.C.S. § 1103—Not less than 4 months nor more than 12 months incarceration, a fine of $15,000, plus the costs of prosecution;

Count 2, Theft by Unlawful Taking, 18 Pa.C.S. § 3921—Not less than 14 months nor more than 48 months incarceration, to run consecutively to the sentence imposed at Count 1, a fine of $10,000, plus the costs of prosecution;

Count 3, Theft of Services, 18 Pa.C.S. § 3926. Count 4, Theft by Deception, 18 Pa.C.S. § 3922 and Count 5, Theft by Failure to Make Required Disposition of Funds Received, 18 Pa.C.S. § 3927—Merged for purpose of sentencing;

Count 6, Criminal Conspiracy (Conflict of Interest/Theft Counts) 18 Pa.C.S. § 903—Not less than 4 months nor more than 12 months incarceration, to run concurrently with the previous sentences.

The sentences at Counts 1 and 2 shall run consecutively.

Restitution in the amount of $466,621.45, subject to modification.

(Transcript of Proceedings, Sentencing, September 25, 2012, p. 11)

Defendant filed a Motion for Bail Pending Appeal on October 5, 2012, The court issued an Order on October 9, 2012 which revoked bail. On the same date, the court issued an Amended Sentencing Order which amended the sentence at Count 2 to not less than 14 nor more than 48 months, less one day. All other aspects of the sentence remain unchanged,

## FACTUAL BACKGROUND

The facts, viewed in the light most favorable to the Commonwealth, as a verdict winner, are as follows:

Defendant served as an elected state representative from January 1991 through July 2006, and policy chairman of the Democratic caucus (hereinafter, "caucus") between 2002 and 2006. (Transcript of Proceedings, Jury Trial, June 6–7, 2012, June 18–21, 2012 and June 25–27, 2012) (Hereinafter, "N.T.") In addition, during the years 2004 and 2005, Defendant served as operations chairman of the House Democratic Campaign Committee, the "HDCC". The HDCC is a privately funded organization dedicated to the effort to elect Democrats to office. (N.T. pp. 134–135).

The Commonwealth presented its case through the testimony of numerous caucus staff employed by the legislature under Defendant's supervision during his tenure as a state representative. The Commonwealth called Erin Madison Grace as a witness.[1] Ms. Madison, who testified under a grant of immunity, was employed by the HDCC from 2004 through 2006. (N.T. p. 134) Ms. Madison was initially employed as a fundraiser during the time Defendant served as chairman of the HDCC. (N.T. p. 136) At the end of the campaign cycle in November or December 2004, Ms. Madison left the HDCC because of a lack of funding for her position, and began working as a research analyst for Defendant in a taxpayer-paid legislative position with the caucus. (N.T. p. 138)

At that time, Defendant served in his elected capacity as the Democratic Policy

---

1. Erin Grace's name at the time of the relevant employment was Madison.

Chairman, responsible for researching and investigating issues, conducting hearings, and reporting information to the caucus. (N.T. p. 139) Ms. Madison met with Defendant, who suggested to her that she maintain her position with the privately funded HDCC, as well as accept the legislative position; that she could do both. (N.T. pp. 144–145) Ms. Madison testified that from late 2004 to summer 2006, she worked for Defendant in his legislative office at the House Democratic caucus as a research analyst. She assisted in researching issues, contacting individuals to speak about policy issues and writing papers on specific issues. *Id.* Ms, Madison testified that Kevin Sidell and PJ Layette, who worked for State Representatives William DeWeese and Representative Michael Veon in taxpayer paid positions, taught her how to utilize PT Database, a software program used to research and track donor contributions to the HDCC. (N.T. pp. 140–141) While she worked on Defendant's legislative staff, she tracked lists of past donors, called potential donors, and confirmed meetings. (N.T. pp. 144–145) Ms. Madison also coordinated events, created invitations, collected donation checks, and scheduled meetings with potential donors, all campaign-related activities. (N.T. p. 146)

In both the HDCC position and on Defendant's legislative staff, Ms. Madison performed the campaign related fundraising for the HDCC and Defendant, as an individual candidate, (N.T. p. 147) Ms. Madison scheduled blocks of time for Defendant to place fundraising phone calls, which usually took place in Defendant's office in his State House office at the Capitol, typically between 9 am and 5 pm, which Ms. Madison described as her normal working hours. (N.T. p. 348) Ms.

Madison testified that prior to a scheduled phone call, she prepared a spreadsheet which included a list of potential donors, or past donors, along with contact information and the history of donations. (N.T. pp. 150–151)

In both the HDCC position and the legislative position, Defendant served in a supervisory position over Ms. Madison, (N.T. p. 152) Ms. Madison estimated that during 2005, she spent an average of 50 percent or more of her time during the 9 to 5 workday performing fundraising activities such as maintenance of the database and processing donations, (N.T. p. 153) Also during the summer of 2005, while a member of Defendant's legislative staff, Ms. Madison assisted with campaign work in a special election of particular interest to the Democratic party, the Minger/Byer race, House District 131, having been copied on an email from Defendant inquiring as to when legislative staff would be sent out in the field to support the race. (N.T. pp. 154–156; N.T. pp. 174–175) Ms. Madison estimated that cumulatively, she worked several weeks, to months, on that election. (N.T. p. 200)

Ms. Madison testified that she understood fundraising and volunteering to be a part of her job, and important to career advancement (N.T. pp. 159–160) She testified that the culture of the caucus was such that the more one volunteered for campaign work, the more likely their career would advance and they would receive bonuses, paid from taxpayer funds. (N.T. pp. 160–161) Ms. Madison earned $34,000 in 2004, $36,270 in 2005, of which $1065 was a bonus, and $48,022 in 2006.[2]

For some of the campaign work performed during the workday, Ms. Madison

<hr>

2. Defendant resigned in 2006. Ms. Madison began working for another state representa-

tive, Todd Eachus. (N.T. p. 235)

used compensatory time ("comp" time), leave accumulated by working beyond the set business hours. She testified that normal work hours, according to the personnel manual, were 40 hour per week, 8:30 a.m. to 4:30 p.m. or 9 a.m. to 5 p.m. (N.T. p. 167; N.T. p. 226)

Using comp time enabled her to perform political work during the regular workday, for which she was paid. Ms. Madison testified that, when discussing the position, Defendant told her she would continue to do campaign fundraising, and he encouraged her to begin accumulating comp time as soon as she started working, so that it could be used for political work, (N.T. pp. 165–166) Ms. Madison testified that after 5 pm, she often worked on the PT Databases, or didn't work, but sent emails and talked to co-workers, or stayed late when she did not have any responsibilities. (N.T. p. 167; N.T. p. 197–198) The comp time was earned, in part, from workday hours in which she performed campaign activities, such that she was earning comp time for non-legislative work. (N.T. pp. 166–369) She testified that Defendant made it clear that she was to use earned comp time to account for periods she performed political activity. (N.T. p. 213)

The majority of fundraising work Ms. Madison performed as a caucus employee was for the Defendant. (N.T. p. 168) However, Ms. Madison did some fundraising for HDCC, as such fundraising benefited other candidates and engendered influence and goodwill. (N.T. p. 170)

The Commonwealth also called Stephen Webb as a witness. Mr. Webb began working for the caucus research office, a publicly paid position, in July 2003. (N.T. p. 276) In 2004 and in 2006, Mr. Webb performed opposition research, which entailed search of information which could be negative to the campaign of an opponent or one's own candidate. (N.T. p. 280) Op-

position research was campaign work, not legislative work, (N.T. pp. 286–287)

Mr. Webb and other caucus employees attended a meeting in 2004 in Defendant's office during business hours. Email communications copied to Defendant reflect discussion of the 2004 opposition research meeting, (N.T. p. 295; Exhibit 22) The email attached a form which was to be filled out for time spent on opposition research. At that meeting, Defendant stressed the importance of opposition research to the party, and asked for discretion in performing the work, since it related to campaign, rather than legislative, work. *Id.* In a June 8, 2004 email Defendant inquired of Michael Veon whether Stephen Webb would remain on the caucus payroll and work out of House District 16 office, approaching a general election for a vacant seat sought by Democratic candidate Sean Ramaley. (N.T. p. 298; Exhibit 27) The email does not reflect a response. (N.T. p. 374)

Mr. Webb testified that the amount of opposition research performed in the caucus increased dramatically from 2004 to 2006 because of the effort to regain a majority in the legislature. (N.T. p. 287)

The Commonwealth also called Dan Wiedemer as a witness. Mr. Wiedemer served as the full time, paid Executive Director of the HDCC from May 2003 to January 2007. (N.T. p. 386) As Executive Director, Mr. Wiedemer oversaw the campaigns of candidates for the state legislating developed fundraising plans, and hired consultants for commercials and polling. (N.T. pp. 387–388) Defendant was chairman of the HDCC, and Mr. Wiedemer's supervisor. (N.T. pp. 398–399) The HDCC hired Erin Madison as political fundraiser in April or May of 2004 (N.T. pp. 388–389; N.T. p. 391) Ms. Madison moved to the House caucus in November 2004, to work for Defendant. However,

she continued to conduct fundraising for the HDCC even while employed by the Commonwealth. (N.T. p. 393) A large percentage of discussions regarding fundraising between Ms. Madison, and Wiedemer, as Executive Director of the HDCC, occurred during the Commonwealth's legislative workday, between 9 am and 5 pm. (N.T. p. 395; N.T. p. 489)

Wiedemer testified that for the 2004 and 2006 campaign cycles, legislative caucus employees performed opposition research. (N.T. p. 401) The HDCC paid employees' expenses, such as mileage and copying, but did not pay their salaries, as the HDCC did not have the funds to do so. *Id.* The HDCC also did not have funds for use of the legal research search engine, Lexis-Nexis, and utilized the account of the House Caucus. (N.T. p. 403)

Wiedemer testified that as a result of an election loss attributed to ineffective opposition research, the HDCC began looking into hiring outside companies to perform opposition research. (N.T. p. 407) Wiedemer spoke to Defendant about the proposal, and the cost to utilize outside firms, Wiedemer learned that firms specializing in opposition research charged $2,500 to $5,000, plus travel expenses, per race. (N.T. pp. 408–409) As HDCC Chair, Defendant decided that use of outside firms was too expensive, and that the HDCC should continue to use legislative staff for that function. (N.T. pp. 411–412)

Ongoing email communications during the workday among Representative Mike Veon, Erin Madison, and Representative Myers dated April 27, 2005 reflect discussion of utilizing taxpayer paid staff for training Myers' district office staff on fundraising. (N.T. pp. 413–416; Commonwealth Exhibit 60) Defendant responded, and expressed nervousness about Erin Madison calling district staff about fundraising. *Id.*

Further emails reflect communications by and to Defendant regarding opposition research reports performed by taxpayer-paid caucus employees. (N.T. pp. 420–426; Exhibit 40) In one such communication, Defendant provided a copy of an opposition research report, inquired about lodging for a staffer working on an election, and indicated "We will be paying [the] salary of [that] person through election." (N.T. p. 427) In a May 25, 2006 series of emails, Defendant requested that his name be added to the list of persons who would be provided the results of opposition research provided by taxpayer-paid caucus staffers. (N.T. pp. 430–432)

Although contributions on behalf of Defendant to HDCC campaign funds raised for 2004 totaled $82,000, those funds were not utilized for opposition research. (N.T. p. 497; Commonwealth Exhibit 56)

The Commonwealth also called as a witness Jessica Walls–Luvelle ("Ms. Walls"). Ms. Walls worked as Political Director of the HDCC for a short period during 2002, then later, from October 2003 to February 2007, (N.T. p. 506) During the second period of her employment, Defendant served as head of the HDCC and an elected representative. (N.T. p. 508) Although Ms. Madison had left the role of HDCC as Finance Director and began working with Defendant in his elected capacity, Ms, Walls continued to address fundraising and finance questions with Ms. Madison. (N.T. pp. 508–509) Most of those communications occurred during the workday. (N.T. p. 510)

In 2005, Ms. Walls and Dan Wiedemer spoke about hiring an outside firm, paid for by the HDCC, to perform opposition research, at a cost of three to five thousand dollars per race. (N.T. pp. 512–513) Ms. Walls testified that the proposal was

"pretty much shot down" by Defendant. (N.T. p. 513)

Paul Martz, a research analyst with the legislative House Democratic Caucus office of Member Services, testified Chat during 2004, he participated in opposition research, which he conducted at his office located in the Capitol. (N.T. pp. 520–524) By 2006, he had access to LexisNexis, a large database, also utilized from his office on the Capitol building. (N.T. p. 525) With the exception of one report, which he wrote at home, he prepared most opposition research reports at his desk in the Capitol during the normal workday. (N.T. p. 527) Mr. Martz used the term "normal work day" to refer to the hours of 9 am to 5 pm.

In 2004, members of the caucus staff in taxpayer-paid positions performed extensive opposition research in important races. (N.T. pp. 528–529) During the 2004 and 2006 election cycles, the intensity of the focus on opposition research and the utilization of caucus staff increased. (N.T. pp. 529–531) During 2006, Mr. Martz spent the majority of his work time on campaign related matters. (N.T. p. 532) Mr. Martz testified that the comp time he did submit was not legitimately earned. (N.T. p. 533) Mr. Martz' boss, Eric Webb, told Martz and other caucus employees that they could stay after hours to earn comp time to campaign, even if they did not have extra caucus duties to perform. (N.T. pp. 533–534) Payment for the comp time utilized came from the budget of the taxpayer-funded House Democratic Caucus. (N.T. p. 534) Martz testified that Defendant did not encourage him to build up comp time, nor did he report the accumulation of time to Defendant. (N.T. p. 548) While never ordered to so, Martz was encouraged by Eric Webb to build comp time. (N.T. p. 533; p. 556)

Martz attended a meeting in Defendant's office in the Capitol building in 2006 which included Dan Wiedemer, Defendant and another representative to discuss the write-in effort of Chelsa Wagner, a Democrat in Pittsburgh. (N.T. p, 535) The meeting occurred during the normal workday. (N.T. p. 536)

Commonwealth Exhibit 107 reflects Mr. Martz' salary for the years 2004, 2005 and 2006. (N.T. p. 538) Mr. Martz earned a total salary of $126,620 for those three years. Mr. Martz testified that approximately seventy percent of his work related to campaign matters. (N.T. p. 539)

Eric Webb also testified.[3] Mr. Webb was employed by the legislative House Democratic Caucus from 1997 through 2007. Mr. Webb became Director of the Office of Member Services in 2005. (N.T. p. 561) During that time, staff of the Office of Member Services, although paid by taxpayer funds, performed campaign work and a majority of the opposition research. (N.T. p. 562)

In 2004, Defendant emailed Webb and thanked him for his service to the caucus in performing opposition research. (N.T. p. 570)

In the 2006 election cycle, Webb participated in meetings with Defendant and Michael Manzo, chief of staff for Representative William DeWeese, to discuss access to the database, LexisNexis, specifically for opposition research, at Defendant's office in the Capitol building. (N.T. pp. 565–566; N.T. p. 622) At that time, Defendant served as Policy Committee Chairman, a leadership position in the caucus. (N.T. p. 566) At the meeting, Defendant raised no objection to the use of LexisNexis, a legislative resource. (N.T. p. 568) Following the meeting with Defendant and Manzo,

---

**3.** Eric Webb is not related to the witness Stephen Webb. (N.T. p. 560)

more LexisNexis passwords became available for opposition research. (N.T. p. 588; N.T. p. 591) Prior to that meeting, no one in Webb's office had a password. (N.T. p. 608)

The Commonwealth called John Jones as a witness, who also testified under immunity. (N.T. p. 740) Mr. Jones began working at the House Democratic Caucus in the research office as a paid intern in 1998. (N.T. pp. 616–617) After graduating from college, Mr. Jones worked as a research analyst in Defendant's office at the Capitol. (N.T. p. 617) In 2004, upon returning to Defendant's office, after a one year departure to the private sector, Mr. Jones performed Defendant's personal legislative work, and an increasing amount of political work overall. (N.T. p. 619) In August 2004, Mr. Jones, along with caucus employees Eric Webb and Renee Diehl were requested to attend a meeting with Mike Manzo, and asked to go to work at the House Democratic Campaign Committee for the remaining time before the election, to assist with mailings on behalf of incumbents. (N.T. pp. 619–620; N.T. p. 622) Those individuals would remain as caucus employees, and account for the time with leave slips. (N.T. p. 620) Manzo told them he would increase their leave time if they did not have enough to cover the time spent at the HDCC. (N.T. p. 621) Jones testified that the arrangement, as presented by Manzo, could not have taken place without Defendant's approval. (N.T. p. 622) Jones believed Defendant's approval was implied in that Jones did not work at the caucus for a few months, and yet Defendant did not question his absence. (N.T. p. 742)

From August 2004 through November 2004, Jones worked full time for the HDCC, although the legislature paid his salary. (N.T. p. 624) Mr. Jones had daily contact with Defendant, and spent 99.9 percent of his time on campaign work. (N.T. p. 627) Jones testified that the comp time he used was not legitimately earned. For example, he built comp time for hours he worked on political rather than legislative matters. (N.T. pp. 628–629) Jones was sensitive to the appearance of working on campaign matters outside of the office, such as opposition research in a county courthouse, and for those assignments, was more likely to turn in a time slip. (N.T. p. 629)

Jones testified that after the 2004 election cycle, Erin Madison joined Defendant's legislative office, but continued to perform fundraising for the HDCC and Defendant individually. (N.T. p. 657)

Also after the 2004 election cycle, Jones met with Dan Wiedemer, and presented a plan to Defendant to increase the amount of caucus resources through the Office of Member Services for campaign use. Defendant participated in those discussions. (N.T. p. 633) During the 2005 primary, Jones worked in Pittsburgh, and in Allentown, on the Minger/Byer race, for approximately 35 days, of which Defendant was aware. (N.T. p. 635)

In August or September, 2005, at Defendant's request, Jones assisted with campaign efforts of York mayoral candidate John Brenner. (N.T. pp. 638–640) Defendant was involved in economic development projects in that area. Jones conducted the Brenner campaign work from Defendant's district office in York, including entering data at his computer at the district office, between the hours of 9 to 5. (N.T. p. 641; N.T. p. 644) During that time, Jones remained a full time caucus employee, although he spent approximately 75 percent of his time on campaign work. (N.T. p. 642; N.T. p. 647)

In 2006, Mr. Jones performed campaign work and opposition research for Defendant's reelection, (N.T. pp. 650–651) Also in 2006, Jones discussed with Defendant

and Michael Manzo, in Defendant's office in the Capitol, utilizing legislative staff for critical primaries, and awarding credit for that work, for evaluation of career advancement, pay increases and bonuses. (N.T. pp. 652–654) An e-mail dated April 27, 2006, to Wiedemer, Defendant, Manzo, Jones and others, confirmed the plan that credit would be awarded for races, as determined, in part, by the HDCC. (N.T. p. 633; Commonwealth Exhibit 81) In addition, an e-mail From Defendant to Jones, and others, further discussed the issue of credit awarded for particular races, and included an attachment of an opposition research report. (N.T. pp. 663–664; Commonwealth Exhibit 89) In an e-mail dated Monday, June 19, 2006, at 2:17 in the afternoon, Jones provided Defendant and others with an opposition research report. (N.T. p. 665; Commonwealth Exhibit 91)

For campaign work performed in 2006, including opposition research, petitions, and attending elections, Jones submitted a small amount of comp time, usually for the most publicly visible work. (N.T. pp. 655–656) During 2006, Jones spent, estimating conservatively, 25 percent of his time on campaign work, although he could have spent as much as 35 to 40 percent, (N.T. p. 667) He received no salary from HDCC for the period of 2004–2006 for campaign work performed. (N.T. p. 666) Commonwealth Exhibit 105 reflects the highest salaries Jones earned for the years 2004, 2005 and 2006, as well as bonuses awarded by the caucus. Commonwealth Exhibit 102 reflects the salaries of House Democratic Caucus members.

Defendant testified that the Personnel and Policy Manual of the House Democratic Caucus provides that employees work an eight hour workday, including a lunch break, and that legislative offices may open at either 8:30 or 9:00 a.m., at the discretion of the supervisor. (N.T. p. 789; p. 879) Defendant testified that he focused on the separation between legislative and campaign work, and imparted that to his caucus staff. (N.T. p. 884)

The defense called as witnesses members of Defendant's legislative staff, some of whom worked at Defendant's office in the Capitol, others at his district office in York. Those witnesses testified that Defendant instructed them to keep legislative and campaign activities separate, and to use leave time for volunteer campaign activities. (N.T. pp. 896–932) Rosemary Green, the secretary and office manager of Defendant's legislative office, testified that legislative and campaign work were commingled throughout the course of the day. (N.T. p. 968)

The defense also called Cameron Texter. Mr. Texter began working for the House Democratic Caucus in 1990, and remained so employed as of the time of trial. (N.T. p. 972) In 2004, Texter worked at the Office of Member Services, ("OMS"). In 2004, he prepared opposition research reports, primarily on his own time. (N.T. p. 973) In 2005, Eric Webb took over as head of OMS. After Eric Webb took over in January 2005, political and opposition research comprised 80 percent of Texter's work. (N.T. pp. 973–974) Representative Veon instructed Texter that he was required to forward copies of opposition research reports to Defendant, which he did. (N.T. p. 978; N.T. pp. 998–999) Defendant would receive a copy through his legislative e-mail or his Blackberry. (N.T. p. 981).

## DISCUSSION

1. THE COURT PROPERLY DENIED DEFENDANT'S PRE–TRIAL MOTION TO COMPEL DISCLOSURE OF ALL PROFFER NOTES, NOTES OF WITNESS INTERVIEWS, SOUND RECORDINGS, OR OTHER RECORDS OF INTERVIEWS, WITH THE OFFICE OF THE ATTORNEY GENERAL.[4]

■ The court properly denied Defendant's motion to compel disclosure of re-

quested investigatory material where such disclosure is not required under *Brady v. Maryland*, rules of criminal procedure governing discovery, or rules of professional conduct.

The record includes no evidence of factual bases of the arguments. The claim mirrors arguments asserted in other cases against other former state representatives at unrelated dockets.[5] For this discussion, we rely upon the brief factual assertions and responses of record as set forth in the Motion for Discovery of Witness Statements Pursuant to Pa.R.Crim.P. 573(B)(2), the Commonwealth's Answer Thereto, and oral argument heard at this docket on February 21, 2012.

 We properly concluded that informal notes compiled by investigators during interviews are not subject to discovery requirements under Pa.R.Crim.P. 573, in that they are not substantially verbatim oral statements "signed, adopted or otherwise shown to be substantially verbatim statements of the witness." Pa. R.Crim.P. 573(B)(20)(a)(ii)-(iii) Pretrial statements of witnesses are discoverable only when those statements have been 1) reduced to writing, 2) relate to the witness' testimony at trial, and 3) are signed, adopted or otherwise shown to be substantially verbatim statements of that witness. *Commonwealth v. Appel*, 547 Pa. 171, 689 A.2d 891, 907 (1997)

In support of the motion to compel disclosure, Defendant asserted that the Office of the Attorney General conducted 165 interviews of 130 witnesses. The Defendant raised claims relating to proffers by witnesses and co-conspirators, the notes of witness interviews made by the investigators or agents, and handwritten notes. Many of the alleged proffers were not under oath, nor sworn handwritten statements signed by the witness. Many proffers occurred in the presence of counsel, although some were provided without counsel. While proffers were being made, agents took notes. The agents summarized what the witness stated, rather than obtaining verbatim statements. The defense sought all information as to all of the 165 interviews.

The defense asserted that of the 165 interviews, the Reports of Investigation ("ROIs") provided by the Commonwealth, contain narrative summaries of only 29 interviews, and that the summaries of those 29 witness statements were incomplete transpositions of the original notes of the interviews.

In addition to the ROI's, the Commonwealth provided the defense with approximately 17 handwritten notes or typed notes of witness interviews. The defense motion also alleged that the Commonwealth did not provide reports, notes, or record of any sort, containing all or even portions of statements made by witnesses during the remaining 119 interviews, which the ROPs indicate did occur.

---

4. Defendant asserts in Issue 1 of the Concise Statement of Matters Complained of on Appeal that ["The trial court"] should have granted the Defendant's Motion to Dismiss and quash this prosecution. The docket does not reflect the filing of a Motion to Dismiss as to this issue, Defendant raised the claims by way of his Omnibus Pre–Trial Motion filed February 1, 2012, Section 17, Motion for Dis-

covery of Witness Statements Pursuant to Pa. R.Crim.P. 573(B)(2).

5. Other cases in which defendants raised similar, although factually distinguishable, claims on appeal, include *Commonwealth v. Feese*, 2585 CR 2010, 1927 2011 Superior Court Docket No. 338 MDA 2012.

■ We concluded that the simple counting of witnesses, summary statements, and notes, did not demonstrate that the Commonwealth failed to comply with disclosure requirements under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). A party seeking *Brady* based relief bears the burden of establishing entitlement to such relief by proving that: 1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; 2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and 3) prejudice ensured to the defendant. *Commonwealth v. Paddy*, 609 Pa. 272, 15 A.3d 431, 450 (2011)

■ We viewed Defendant's claim as an effort to search the Commonwealth's evidence for potentially relevant evidence. "Defense counsel has no constitutional right to conduct his own search of the state's files to argue relevance." *Commonwealth v. Santiago*, 439 Pa.Super. 447, 654 A.2d 1062, 1069 (1994) quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 60, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) The ROI's to which the defense referred encompassed a multi-year investigation into alleged corruption within the House Democratic Caucus, which resulted in charges against 15 individuals. The separate and unrelated dockets of numerous other defendants, and the majority of the witnesses who appeared therein, have no relevance in the instant proceeding. The Commonwealth provided to the defense 17 sets of notes in discovery which pertain to proffer sessions with witnesses who provided information relevant to Defendant.

The Commonwealth provided statements which fell within its discovery obligations. At trial, the defense exercised the opportunity to utilize notes of interview to cross examine witnesses as to their recollection of statements made in interviews, and assert inconsistencies. Defendant admitted into the record the handwritten notes of interviews conducted by the Office of the Attorney General of witnesses Erin Madison, (Defendant's Exhibit 100), Paul Martz, (Defendant's Exhibit 101) and Stephen Webb. (RT. pp. 1002–1003) During cross examination of Erin Madison, defense counsel referred to a handwritten statement, seeking to impeach. The witness testified that she recalled the conversation regarding separation of legislative activities and campaign activities, but did not remember using the exact words which appeared in the handwritten statement. (N.T. pp. 189–193)

Also at trial, Defense counsel utilized the notes of interview of Stephen Webb. (N.T. pp. 353–357) Defense counsel cross-examined Mr. Webb regarding the note-taking process of agents of the Attorney General's office during their interview of Webb, as well as his recollection of statements made. *Id.*

Having found that the Commonwealth violated no obligations under Pa.R.Crim.P. 573 or *Brady*, we find no basis on which to conclude that the Commonwealth attorneys committed ethical violations with respect to the requested disclosures.

*Emergency Motion of Matthew H. Haverstick, Esq., to Quash Defendant's Trial Subpoena*

■ By Order of June 18, 2012, the trial court properly granted the Emergency Motion of Matthew H. Haverstick, Esq., to Quash Defendant's Trial Subpoena.

On June 14, 2012, Defendant directed a trial subpoena to Matthew Haverstick, Esq., seeking "any and all notes or reports created by [Mr. Haverstick] related to interviews conducted by persons representing the Office of the Attorney General with [Mr. Haverstick's] counsel, Attorney Haverstick represented 67 individual members

of lite House Democratic Caucus in connection with the political corruption investigation."

Defendant's subpoena sought to re-litigate the issue of requests for notes and interviews, denied in our order of May 30, 2012, and was therefore precluded by the law of the case doctrine. See, *Commonwealth v. McCandless*, 880 A.2d 1262 (Pa.Super.2005)

Further, Defendant's subpoena broadly requested any and all notes and reports related to the Office of Attorney General's interviews of Mr. Haverstick's clients. Such request would impermissibly require production of notes and summaries which included attorney's mental impressions. *Upjohn Co. v. United States*, 449 U.S. 383, 399, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)

## 2. NO ERROR OR PREJUDICE OCCURRED WHERE THE COURT, HAVING OBTAINED THE AGREEMENT OF COUNSEL TO ENTER THE JURY DELIBERATION ROOM, PROPERLY RESPONDED TO THE JURY'S REQUESTS FOR CLARIFICATION REGARDING EXHIBITS AND LEGAL INSTRUCTIONS.

At the conclusion of the day on which the court provided the charge to the jury, with the permission of counsel, the court entered the jury deliberation room, excused the alternates, and provided brief instructions that, upon their return the following day, the jury should write down and bring to the court's attention questions as to the availability of exhibits and legal instructions. (N.T. pp. 1156–1157)

The following day, June 26, 2012, after having met with counsel, again with counsel's permission, the court returned to the jury deliberation room to address jurors' questions and requests for exhibits. (N.T. pp. 1162–1164) The court related that it could provide a requested letter referred to in closing argument (N.T. p. 1165)

In response to additional questions, the court properly responded that, regarding testimony, the jurors must rely upon their notes and recollections. (N.T. p. 1165) The court reminded the jury that it could seek clarification as to instructions on the law, (N.T. p. 1167) In that discussion, the jury indicated to the court that it had a list of questions. The court provided brief explanation, then apprised the jury that before proceeding further, it would apprise counsel of the additional questions. (N.T. p. 1169) The responses provided were correct, non-prejudicial and did not infringe upon the role of the fact finder.

Contrary to Defendant's argument, the court made no statement or suggestion that the Defendant knew that certain conduct was wrong. (Defendant's Concise Statement of Matters Complained of on Appeal, 2(c)) Without the benefit citation to the transcript in the Concise Statement, we surmise that Defendant may refer to the court's response to a question regarding the element of knowledge as to the theft statute. The following exchange occurred:

JUROR: Compensation. I don't know if you added that. Compensation. That one is very vague for me, the Defendant knew the services were available only for compensation,

THE COURT: They were available only if they used campaign funds. That's what—in other words those funds were not used for—the legislative funds that paid folks to go do the campaigning, the Defendant knew that was wrong. That's the bottom—knew that they were only available for the compensation to come from. That's what that is. That's that element.

Leave me go back before you have any more questions. I don't want to get

too far afield. That's the law. But I want to Let them know. I'll share that when I go back up with them.

Leave me go back upstairs, meet with them, and come downstairs and we can deal with these questions as well. All right. Thanks.

(N.T. p. 1109)

Taken in its proper context, the court's explanation did not provide a conclusion as to the Defendant's conduct, but rather, addressed the issue of the element on the statute regarding which they inquired, that is, knowledge.

In an in-chambers discussion with counsel, the court described what occurred in the deliberation room, including the jury's inquiries regarding questions of law. The court accurately related the information to counsel as follows:

THE COURT: We're in chambers with counsel. We just returned from the jury deliberation room. What we did, we gave them all the exhibits, then went to that question. And I said I'm here with your permission. We already talked about this.

Our first discussion about the documents was the 120 exhibits and only getting so many. They said that's not really what we meant after we heard it. I said, we just can't explain—specify what document you said you're looking for.

So when I said that, they said no, no, Mr. Lock had—I think you read the DeWeese Setter in your closing.

MR. LOGIC: Yes.

THE COURT: So they want to see that. Then the other—I said the only document I recall was LexisNexis and they remembered that as Well, but they said that wasn't what we were asking, that it was that DeWeese letter.

I said I don't see that as a problem, we can bring that down to you. But I think you did do that and you did identify that.

MR. LOCK: Yes.

THE COURT: They want to take a look at that, Then the other—again, I'm telling you when you go down there, then they start asking more questions.

One person asked can you define—no, one of the guys asked knowing and intentional conduct, what it is. They want that definition again. And then they wanted some of the elements. One of the fellows asked about—I think it was the theft of services charge, I forget what charge it was, but one of the elements was that the Defendant had to know it was only available for compensation.

It's this. It's when he used—he could understand you used—that Stetler would had to know that he would have had to use campaign funds to pay to use staff rather than legislative funds. That's what he was asking about. So that was a question he had.

So they want to the intentional, knowing, that one element at least one of them wanted. Then there's some other things that I don't know. Again, I'll let you look at those as well.

(The court and counsel then engaged in a discussion regarding questions regarding witness' testimony and exhibits.)

THE COURT: Again, if they want intentional conduct or knowing conduct defined, I will give them the same thing I said out there. It was the nature of his conduct, it was a conscious object to bring about a desired result. That's the intentional.

Knowing is the nature of his conduct and the circumstances, it was practically certain, you know, that he had to be practically certain that this or aware I think it is the charge says, practically.

I'll have to get it cleaned up myself and look at my charge, but it's just practically certain.

I'll do that. That's it No more. We did talk about Stetler, Madison and Jones testimony. I said you've got to use your notes and recollection. They sort of chuckled. You gave this to us right away which tells me you did not really go through all of their testimony.

But do that, use your notes, and then if you have some still have some concerns, please let us know. I'm not cutting you off from asking that again, but you've got to go through it.

That was it. That's about all we did. That one element the guy wanted with the campaign thing. He asked that question. I'm going to go down and tell them no, we just—I don't even think any—those you have to—I know we talked about comp sheets. That's all. No one really produced any or showed any.

Mr. BROWN: No.

THE COURT; We're going to tell them we can't answer those. There was no evidence at all.

\* \* \*

(N.T. pp. 1170–1175)

Counsel raised no concern or objection, and agreed that the court could return to the deliberation room to address the questions reviewed. (N.T. pp. 1176–1177)

Upon return to the deliberation room, the court properly responded that some questions could not be answered because evidence about which they inquired was not part of the record. (N.T. p. 1178) The court also properly responded that the jury must make its own factual determinations based upon their recollection of testimony, (N.T. pp. 1178–1179)

Further, in keeping with the matters reviewed with counsel, with counsel's permission, the court provided clarification regarding the definition of intentional conduct, (N.T. p. 1179) The court provided examples to illustrate the element, and properly described intentional conduct as the actor having a conscious object to bring about a desired result. It further correctly described "knowingly" as in the commission of a crime, as a practical certainly that a result would occur. (N.T. p. 1179) The court reiterated that that mere knowledge of a criminal act is not a crime, although non-criminal acts could be in furtherance of a conspiracy where an individual benefits from criminal behavior. (N.T. p. 1183) See, Commonwealth v. Lambert, 795 A.2d 1010, 1016 (Pa.Super.2002) (Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient. In some situations, participation in the object of the conspiracy by receiving a portion of its proceeds is relevant.)

3. THE COURT PROPERLY DENIED THE MOTION TO DISMISS THEFT COUNTS WHERE, UNDER PROPER CONSTRUCTION OF THOSE STATUTES, THE COMMONWEALTH MAY BE THE VICTIM OF THE OFFENSES.

Defendant's claims as to Theft by Deception 18 Pa.C.S. § 3922, Theft by Unlawful Taking or Disposition 18 Pa.C.S. § 3921, and Theft of Services 18 Pa.C.S. § 3926, ("theft statutes") present issues of statutory construction. The principles of the rules of statutory construction, as set forth the Statutory Construction Act, 1 Pa.C.S. § 1501 et seq., require that each statute be read to include the Commonwealth as a victim.

*Theft by Deception 18 Pa.C.S. § 3922 and Theft by Unlawful Taking or Disposition 18 Pa.C.S. § 3921*

■ Defendant's argument that the Commonwealth may not be a victim under

these theft statutes contravenes rules of statutory construction. The statutes provide, in relevant part:

Theft by Deception 18 Pa.C.S. § 3922,

(a) Offense defined.—A person is guilty of theft if he intentionally obtains or withholds *property of another* by deception.

Theft by Unlawful Taking or Disposition 18 Pa.C.S. § 3921,

(a) Moveable property.—A person is guilty of theft if he takes, or exercises unlawful control over, moveable property of another with intent to deprive him thereof.

The plain language of both Theft by Unlawful Taking and Theft by Deception statutes prohibits theft of "property of another". Pursuant to 18 Pa.C.S. § 3901, "property of another" includes "property in which any person other than the actor has an interest which the actor is not privileged to infringe, regardless of the fact that the actor also has an interest in the property . . ."

Further, whenever an intent to defraud is required in any statute in order to constitute an offense, the statute shall be construed to require only an intent to defraud any person or body politic. § 1931 Intent to Defraud. Black's Law Dictionary defines "body politic" as a state or nation or public associations. Black's Law Dictionary (6th Edition 1990). Therefore, the property of another includes the property of a state.

Interpretation of the statute to exclude the property of the Commonwealth or the Commonwealth as a victim would favor private interest over public, that is, taxpayer-funded resources, in contravention of 1 Pa.C.S.A. § 1922(5) ("[t]he General Assembly intends to favor the public interest against any private interest.")

Application of Defendant's argument would lead to an unreasonable conclusion in contravention to 1 Pa.C.S. § 1922(1) which provides, "[t]he General Assembly does not intend a result that absurd, impossible of execution or unreasonable . . .", Under Defendant's theory, any individual could alone or in a conspiracy steal slate funds or equipment without punishment. *Theft of Services 18 Pa.C.S.A. § 392*

■ The Theft of Services statute does not limit those who can be a victim, nor a class of victims, and cannot be read to exclude the Commonwealth.

The statute provides, in relevant part, Theft of Services 18 Pa.C.S. § 3926

(a) Acquisition of services.—

(1) A person is guilty of theft if he intentionally obtains services for himself or for another which he knows are available only for compensation by deception or threat . . .

(b) Diversion of services.—A person is guilty of theft if, having control over the disposition of services to others to which he is entitled, he knowingly diverts such services to his own benefit or another not entitled thereto.

For the same reasons as cited above, exclusion of the Commonwealth's interest in taxpayer-funded resources as a victim foils to properly apply rules of statutory construction.

4. SUFFICIENT EVIDENCE SUPPORTS THE VERDICT OF GUILTY OF CONFLICT OF INTEREST WHERE DEFENDANT USED THE AUTHORITY OF HIS OFFICE FOR HIS PRIVATE PECUNIARY BENEFIT, NAMELY, SUPPORT OF THE HDCC AND HIS OWN INTEREST IN RE-ELECTION BY USE OF TAXPAYER FUNDS FOR. OPPOSITION RESEARCH AND PARTY CAMPAIGN ACTIVITIES.

■ Ample evidence supports the verdict of guilty of Conflict of Interest.

The standard of review of such claim is beyond purview.

When evaluating a sufficiency claim, [the appellate court's] standard of review is whether, viewing all of the evidence in the light most favorable to the Commonwealth, the factfinder reasonably could have determined that each element of the crime was established beyond a reasonable doubt. The court considers all the evidence admitted, without regard to any claim that some of the evidence was wrongly allowed. [The appellate court does not] weigh the evidence or make credibility determinations. Moreover, any doubts concerning a defendant's guilt were to be resolved by the factfinder unless the evidence was so weak and inconclusive that no probability of fact could be drawn from that inference.

*Commonwealth v. Habay*, 934 A.2d 732, 735 (Pa.Super.2007)(internal citations omitted)

The jury in this case found Defendant guilty of violation of the Conflict of Interest statute, which provides:

(a) Conflict of interest. No public official or public employee shall engage in conduct that constitutes a conflict of interest.

65 Pa.C.S. 1103(a)

"Conflict" or "conflict of interest" is defined as "[u]se by a public official or public employee of the authority of his office or employment or any confidential information received through holding his public office or employment for the private pecuniary benefit of himself[.]" 65 Pa.C.S. § 1102

The Superior Court has found "private pecuniary benefit" to include use of legislative employees to perform campaign work. In finding that sufficient evidence supported the verdict of violation of the statute, the Superior Court in *Commonwealth*

*v. Habay*, 934 A.2d 732 (Pa.Super.2007), explained that, "the conflict of interest statute involves deceiving the state for personal benefit." at 736. The defendant in *Habay*, like the Defendant in the instant case, allegedly controlled and wrongfully diverted the services of person's employed by the state in his legislative office for his own pecuniary interests, namely, campaign services for which he did not pay.

In this case, the evidence demonstrated that through the authority of his office as an elected state representative and Democratic Policy Chairman, Defendant utilized the taxpayer paid services of Erin Madison, whom he supervised, to conduct fundraising for the HDCC and Defendant as an individual candidate, in addition, taxpayer-paid employees under his supervision conducted opposition research to assist Defendant and his political party in their campaign efforts. In doing so, Defendant, using the authority of his office, enjoyed the benefit of campaign work to attain re-election without paying for those services.

5. NO UNCONSTITUTIONAL VAGUENESS EXISTS AS TO THE CONFLICT OF INTEREST PROVISIONS OF THE PUBLIC OFFICIAL AND EMPLOYEE ETHICS ACT.

The Superior Court has reviewed and rejected the claim of unconstitutional vagueness of the Conflict of Interest statute in *Commonwealth v. Habay*, 934 A.2d 732 (Pa.Super.2007)

Defendant in this case, without further specificity, asserts that the conflict of interest statute is "unconstitutionally vague or vague as applied." (Defendant's Concise Statement of Matters Complained of on Appeal, para. 5) The Court in *Habay* outlined the principles applicable to vagueness challenges, as "facial" and "as applied". The Court provided analyses of

both types of challenges, and held that the words and phrases "[u]se ... of the authority of his office or employment" and "for the private pecuniary benefit of himself" constitute "commonly understood words in readily comprehensible ways." *Id.*, at 737–738. The Court reasoned,

There is nothing unclear about the concept of using the authority of an office to obtain private pecuniary benefit. The statute prohibits people who hold public offices from exercising the power of those offices in order to secure financially related personal gain.

\* \* \*

Given the straightforward language of the statute at hand, we find it sets forth the crime of conflict of Interest with sufficient definiteness that [Habay] and indeed any ordinary person could understand and predict what conduct is prohibited. It speaks fair warning of the proscribed conduct.

*Commonwealth v. Habay,* 934 A.2d 732, 738 (Pa.Super.2007)

Accordingly, the Court should reject Defendant's claim of unconstitutional vagueness.

6. SUFFICIENT EVIDENCE SUPPORTS THE VERDICT OF GUILTY OF THEFT BY UNLAWFUL TAKING OR DISPOSITION, WHERE THE DEFENDANT, HIS ACCOMPLICE OR CONSPIRATOR, TOOK THE MOVEABLE PROPERTY OF THE VICTIM, COMMONWEALTH TAXPAYER FUNDS INTENDED FOR LEGISLATIVE PURPOSES, WITH THE INTENT TO DEPRIVE THE VICTIM THEREOF.

The evidence supports conviction of the offense of Theft by Unlawful Taking or Disposition under 18 Pa.C.S. § 3921, which provides, in relevant part:

(a) Moveable property.—A person is guilty of theft if he unlawfully takes, or exercises unlawful control over moveable property of another with intent to deprive him thereof. 18 Pa.C.S. § 3921.

"Moveable property" as property the location of which can be changed, including documents, and anything of value, including tangible and intangible personal property. *See,* 18 Pa.C.S. § 3901. Further, "property of another" includes property in which "any person other than the actor has an interest which the actor is not privileged to infringe." *Id.*

The testimony of witnesses Erin Madison, Stephen Webb, Dan Wiedemer and John Jones demonstrated that Defendant knowingly exercised control over property of another, that is, the value of caucus employees' salaries taxpayer-paid salaries, and unlawfully controlled that property by diverting it to the benefit of the HDCC with intent to deprive the taxpayers of the Commonwealth of the value of that taxpayer paid time.

7. SUFFICIENT EVIDENCE SUPPORTS THE VERDICT OF GUILTY OF THEFT OF SERVICES WHERE DEFENDANT, HIS ACCOMPLICE OR CONSPIRATOR, OBTAINED BY DECEPTION TAXPAYER–PAID SERVICES FOR OPPOSITION RESEARCH, WHICH DEFENDANT KNEW WERE AVAILABLE ONLY FOR COMPENSATION.

Ample evidence supports the conclusion that Defendant, as an accomplice or conspirator, intentionally acquired the services taxpayer paid staff and resources, and diverted those to his own benefit,

namely re-election, and to the benefit of the HDDC.

The jury found Defendant guilty of Theft of Services, pursuant to, 18 Pa.C.S. § 3926, which provides, in relevant part:

(a) Acquisition of services.—

(1) A person is guilty of theft if he intentionally obtains services for himself or for another which he knows are available only for compensation, by deception or threat ...

(b) Diversion of services.—A person is guilty of theft if, having control over the disposition of services of others to which he is not entitled, he knowingly diverts such services to his own benefit or to the benefit of another not entitled thereto.

The jury heard evidence that Defendant directed Erin Madison, a member of his Legislative staff, to conduct fundraising for the HDCC while on state time, diverting those services from taxpayers to the private interests of Defendant and the HDCC.

The jury also heard and considered evidence that Defendant, in concert with other caucus members, utilized state-paid time and resources, LexisNexis, to perform opposition research for the benefit of the HDCC, for which the HDCC would had otherwise had to pay, but could not afford. Further, Defendant, in participation with caucus staff and other state representatives, encouraged and approved accrual of taxpayer-paid leave time through performance during the legislative workday of campaign activities. Employees then utilized the taxpayer-paid leave to assist in campaign efforts.

All of this evidence supports the finding of guilty on the charge of Theft of Services,

## 8. SUFFICIENT EVIDENCE SUPPORTS THE VERDICT OF GUILTY OF THEFT BY DECEPTION WHERE DEFENDANT, HIS ACCOMPLICE OR CONSPIRATOR, INTENTIONALLY OBTAINED OR WITHHELD PUBLIC TAXPAYER FUNDS BY KNOWINGLY USING SUCH PUBLIC FUNDS FOR NON-LEGISLATIVE PURPOSES.

 Ample evidence supports the jury's conclusion of Defendant's guilt of Theft by Deception. under 18 Pa.C.S. § 3922 which provides, in relevant part,

(a) Offense defined.—A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives If he intentionally:

(1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind ...

The Commonwealth presented evidence, as cited at length above, that the Defendant, his accomplice or co-conspirators, obtained the property of another, that is, taxpayer paid employee salaries, services and resources, employees performed opposition research utilizing state-owned LexisNexis, and withheld that property from its intended use, the legislature. Defendant participated in intentional deception by knowingly directing, encouraging or allowing caucus employees to build compensation time, although performing non-legislative work, during their taxpayer-paid workday. Defendant was aware of time records submitted caucus employees which reflected legislative hours and leave time, but in fact included campaign hours in some instances, as much as 50 percent.

9. SUFFICIENT EVIDENCE SUPPORTS THE VERDICT OF GUILTY OF THEFT BY FAILURE TO MAKE REQUIRED DISPOSITION OF FUNDS RECEIVED WHERE DEFENDANT, HIS ACCOMPLICE OR CO–CONSPIRATOR, OBTAINED PUBLIC TAXPAYER FUNDS SUBJECT TO THEIR KNOWN LEGAL OBLIGATION WITH RESPECT TO SUCH FUNDS, INTENTIONALLY USED THOSE FUNDS FOR CAMPAIGN PURPOSES, AND FAILED TO MAKE PROPER DISPOSITION OF SUCH PUBLIC FUND.

 Ample evidence also supports conviction of Theft by Failure to Make Required Disposition of Funds, under 18 Pa. C.S. § 3927 which provides, in relevant part:

(a) Offense defined.—A person who obtains property upon agreement, or subject to a known legal obligation, to make specific payments or other disposition, whether from such properly or its proceeds or from his own property to be reserved in equivalent amount, is guilty of theft if he intentionally deals with the property obtained as his own and fails to make required payment or disposition. The foregoing applies notwithstanding that it may be impossible to identify particular property as belonging to the victim at the time of the failure of the actor to make the required disposition or payment.

(b) Presumptions.—An officer or employee of the government or of a financial institution is presumed:

(1) to know any legal obligation relevant to his criminal liability under this section.

\*　　\*　　\*

18 Pa.C.S. § 3927

 As an employee of the government of the Commonwealth, an elected state representative, Defendant was presumed to know of his legal obligation with respect to taxpayer-paid legislative staff, "Government" is defined as "[t]he United States, any state, county, municipality, or other political unit, or department or agency or subdivision of any of the foregoing, or any corporation or other association carrying out the function of the government," 18 Pa.C.S. § 3901. "The statute proscribing theft by failure to make required disposition of funds received is designed to require the actor to meet the obligation under which he undertook to collect monies or properly of another," *Commonwealth v. Wood,* 432 Pa.Super. 183, 200, 637 A.2d 1335, 1344 (1994)

Defendant failed to make proper disposition of taxpayer funds collected for legislative purpose, and instead, dealt with them as his own in participating in the diversion of such funds for campaign purposes. Specifically, as to Erin Madison, Defendant directed that she maintain her state-paid caucus position, but perform work for the HDCC.

10. THE PROSECUTION PRESENTED AMPLE DIRECT AND CIRCUMSTANTIAL EVIDENCE IN THE FORM OF TESTIMONY AND DOCUMENTS WHICH DEMONSTRATED DEFENDANT'S ROLE AS A CONSPIRATOR IN THE THEFT OFFENSES, AND THE CRIME OF CONFLICT OF INTEREST.

We note at the outset that Defendant fails to assert with sufficient specificity, the statute, and elements thereof upon which he bases the claim of lack of sufficiency of evidence of conspiracy. Defendant's vague challenges to the sufficiency of the evidence impede the trial courts ability to address the issue for appellate

review. See, *Commonwealth v. Lord,* 553 Pa. 415, 719 A.2d 306, 308 (1998)("The purpose of Rule 1925 is to aid trial judges in identifying and focusing upon those issues that the parties plan to raise on appeal.") *Commonwealth v. Lord,* 553 Pa. 415, 719 A.2d 306, 308 (1998). Further, a vague 1925 Statement is tantamount to none at all. *Commonwealth v. Lemon,* 2002 PA Super 234, 804 A.2d 34 (2002).

We view Appellant's 1925(b) Statement as to Issue 10 as so vague as to impede meaningful review, the equivalent to none at all, and therefore waived,

If not deemed waived, we can only construe Defendant's challenge to the conviction of conspiracy as all of the six counts. Ample evidence supports the conclusion that Defendant, as an elected public official, and Democratic Policy Chairman, knowingly and intentionally, with other caucus members committed the theft offenses fully analyzed, *supra,* and conspired to use the authority of his office for private pecuniary gain. As chairman of the HDCC, Defendant oversaw efforts to elect Democrats to office, including Defendant himself.

Pursuant to the Crimes Code conspiracy is defined as follows:

(A) A person of guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime.

18 Pa.C.S.A. § 903 (1973)

While more than mere association must be shown,

[t]he essence of criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. By its very nature, the crime of conspiracy is frequently not susceptible of proof except by circumstantial evidence. And although a conspiracy cannot be based upon mere suspicion or conjecture a conspiracy may be inferentially established by showing the relationships, conduct or circumstances of the parties, and the overt acts on the part of the coconspirators have uniformly been held competent to prove that a corrupt confederation has in fact been formed.

*Commonwealth v. Volk,* 298 Pa.Super. 294, 300, 444 A.2d 1182 (1982) (internal citations omitted)

The Commonwealth can establish the existence of an agreement by circumstantial evidence, and need not rely on direct evidence. *Commonwealth v. Roux,* 465 Pa. 482, 350 A.2d 867 (1976). *See also, Commonwealth v. Holmes,* 482 Pa. 97, 393 A.2d 397 (1978).

As cited in detail, supra, email communications document Defendant's knowledge and approval of the use of taxpayer-paid caucus staff to conduct opposition research, on taxpayer paid time and equipment, in support of Democratic candidates' re-election. Defendant participated in email conversations and meetings which planned utilization of taxpayer-paid staff for campaign support. While caucus staff testified that Defendant did not "force" anyone to assist with campaign efforts, they understood that such work played a significant role in career advancement, salary and bonus considerations.

11. THE COURT WAS NOT RE-QUIRED TO CONSIDER. DEFENDANT'S ABILITY TO PAY WHEN IT IMPOSED, AS A TERM OF THE DIRECT SENTENCE, RESTITUTION IN AN AMOUNT BASED UPON TRIAL EVIDENCE OF THE VALUE OF TAXPAYERS FUNDS IMPROPERLY DIVERTED.

At sentencing, the court considered Sentencing Memoranda submitted by the Commonwealth and Defendant. In imposing restitution, the court considered the chart attached to the Commonwealth's Sentencing Memorandum, which set forth the monetary value of services at issue in the theft and conflict of interest charges against Defendant, namely, the salaries of taxpayer-paid employees, the percentage of employees' time spent on campaign, activities, and the value of opposition research performed by caucus employees, for which the HDCC did not pay. (*See*, Transcript of Proceedings, Sentencing, September 25, 2012). The testimony of witnesses at trial well supported the conclusion that Defendant's conduct amounted to misuse of taxpayer funds in excess of $400,000, to the benefit of Defendant and his political party.

 At the time of sentencing, we noted Defense Counsel's opposition to the amount of restitution asserted, $466,621.45, and provided the defense an opportunity to file an opposing statement. *Id.* at p. 871, With that in mind, we specifically stated, in imposing restitution, that the amount may be modified. *Id.*, at p. 875, The defense filed no opposing statement.[6]

Because we imposed restitution as a direct sentence under the Crimes Code, rather than a condition of probation, Defendant's ability to pay need not be considered. The Crimes Code provides, in relevant part:

(a) General Rule.—Upon conviction for any crime wherein property has been stolen, converted or otherwise unlawfully obtained, or its value substantially decreased as a result of the crime, or where the victim suffered personal injury directly resulting from the crime, the offender shall be sentenced to make restitution in addition to the punishment prescribed therefore.

\* \* \*

(b) Mandatory restitution,—

(1) The court shall order full restitution.

(i) Regardless of the current financial resources of the defendant, so as to provide the victim with the fullest compensation for the loss.

Title 18 Pa.C.S.A, § 1106.

See also, *Commonwealth v. Colon,* 708 A.2d 1279, 1284 (Pa.Super.1998) ("Only upon default is defendant's ability to pay to be considered.")

Even were the court required to consider Defendant's ability to pay, evidence well supports the conclusion that Defendant's education and business experience, reflected in Defendant's testimony and that of character witnesses, render him able to comply with the restitution order. (N.T. pp. 752–764; pp. 932–965). *See, e.g. Commonwealth v. Celane,* 311 Pa.Super. 93,

---

6. We are cognizant that "challenges to the appropriateness of a sentence of restitution are generally considered Challenges to the legality of the sentence." *Commonwealth v. Colon,* 708 A.2d 1279, 1280 (Pa.Super.1998). The legality of a sentence is an issue that cannot be waived, *Commonwealth v. Edrington,* 780 A.2d 721, 723 (Pa.Super.2001) citing *Commonwealth v. Archer,* 722 A.2d 203, 209 (Pa.Super.1998) Therefore, Defendant's failure to provide a statement in opposition does not preclude review of this challenge.

457 A.2d 509 (1982)(Defendant's education, experience, success with various business operations reflect potential capacity to repay restitution).

Accordingly, Defendant's claims of sentencing error lack merit.

12. NO PREJUDICIAL ERROR OCCURRED WHERE THE COURT PERMITTED THE JURY, WITH APPROPRIATE INSTRUCTION, TO REVIEW A DOCUMENT, SUPPORTED BY THE TESTIMONY OF TRIAL WITNESSES, TO WHICH THE COMMONWEALTH REFERRED IN CLOSING ARGUMENT.

■■ The court committed no prejudicial error where it allowed the jury, upon their request, to see a chart utilized by the Commonwealth in its closing argument.

Upon receipt of a note from the jury, the court discussed the request with counsel to accurately identify the document requested, (N.T. pp. 1187–1193)

With the permission of counsel, the court addressed the jury in order to seek clarification of the exact document requested. (N.T. pp. 1194–1204) The jury confirmed that the document requested was that utilized by the prosecution in closing argument, which included Lexis-Nexis totals. (N.T. p. 1194) [7] The record reflects that the prosecution referred to the chart in closing argument as follows:

BY MR. SPROW (FOR THE COMMONWEALTH):

So what about the *de minimus* element, which is element No. 3? *De minimus* means an economic consequence which has an insignificant effect. This is meant for things where somebody takes $25 or there's a small amount of money taken or a small amount of loss.

Let's look at the amount of money we are talking about in this case. You heard the testimony from the different witnesses in this case who talked about their salaries and the percentage of their taxpayer-funded time that they were spending doing campaign work.

Obviously, your recollection of the testimony is what controls, but this is an outline of what we're talking about here. If we can blow it up a little bit and focus on the top part.

You've got Erin Madison [who] testified that in 2005 when she was paid totally by the caucus, 50 percent or more of her work time is spent doing campaign work. Her salary that year, annual salary is over $36,000, which means just for Erin Madison alone, we're talking about over $18,000.

Then you've got Paul Martz. In 2006, 70 percent of his work time—and he said that was a conservative estimate—was spent doing campaign work. Mow we used the 2005 salary for Martz because he said he got a raise right at the end of '06 that wouldn't have covered the whole year, so we'll just stick with the '05 number. 70 percent of that is over $28,000.

John Jones, all the campaign work that he did, the percentages listed, between going to the HDCC in '04, the Minger/Byer campaign, the mayor's race in York, all those things with the increasing percentages of his time being spent on campaign, the total is

---

**7.** Counsel's argument, and the information asserted, tracks in all respects with the chart attached as Attachment "A" to the Commonwealth's Sentencing Memorandum filed September 19, 2012.

just over $66,000 of taxpayer resources just with those caucus staff being used.

Now, if you can scroll up, what about the opposition research? Dan Wiedemer told you for the 2004 cycle, he priced it out. The opposition research with a private firm, anywhere between 52,500 and $5,000 per race.

You multiply that by the number of races that they are doing opposition research for with the caucus staff, its at least 100,00 in '04; '06 somewhere between 300,000 and $500,000 saved by the HDCC because they're relying on caucus staff for opposition research.

At the bottom here we have Lexis-Nexis. We talked about that, $1300 a month more or less. You can see the document that then defense introduced. And look, month after month, 1200 some dollars every month being paid by the caucus.

(N.T. pp. 1111–1113)

Defense counsel did not object to the Commonwealth's argument or the chart's summation of evidence.

With the permission of counsel, the court addressed the jury to respond to the request for the chart. The court reminded jurors to rely upon their recollection and, as the trier of fact, assess the credibility of the witnesses rather than placing undue reliance upon the chart. The court instructed:

THE COURT; Again, leave me give you a special—some instructions with the use of that. That exhibit was prepared based on the testimony throughout the trial. You'll see the names on there, like Erin Madison, Just because that becomes a document doesn't mean it's absolutely fact.

You still have the credibility of the witness who made it—and who provided that. And if your recollection differs, you know, you still have that—you use that, not that exhibit, even though it was prepared, but ultimately you're the finder of fact.

So that really is just an aid for you but you are still making your credibility determinations and your recollection from your notes. You may have something different. So feel free to do that.

(N.T. pp. 1194–1195)

 Pennsylvania Rules of Criminal procedure provide that, upon retiring, the jury may take with it such exhibits as the judge deems proper, with the exception of a trial transcript, written or recorded confession, the information or indictment, or written jury instructions, other than portions of the charge on the elements of the offense. Pa.R.Crim.P. 646. Allowing the jury to view, in deliberations, documentary evidence used to illustrate or explain, although not admitted into evidence, does not *per se* create prejudicial error. "An error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict." *Commonwealth v. Strong,* 575 Pa. 433, 836 A.2d 884, 887 (Pa.Super.2003) citing, *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155, 162 (1978)

Any alleged error in allowing the jury to view the chart during deliberations was harmless. As set forth at length, *supra,* numerous witnesses testified, subject to cross-examination, as to the evidence set forth in the chart. Defense counsel did not object to use of the chart during closing, or whether it accurately reflected the witness' testimony. The court provided a cautionary instruction that jurors must

rely on their own recollections of testimony, and make their own credibility determinations. Accordingly, no harm resulted in allowing the jury to view the chart during deliberations.

13. THE COURT PROPERLY DENIED THE DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE REFERENCE TO A "NORMAL WORKDAY" WHERE THE PERSONNEL POLICY ESTABLISHED, AND WITNESSES UNDERSTOOD THAT TO MEAN, THE HOURS OF 8:30–4:30 or 9:00–5:00.

 Defendant raised this issue by motion *in limine,*[8] filed February 1, 2012, to which the Commonwealth filed an Answer on February 16, 2012. The trial court denied the motion *in limine* by Order filed May 30, 2012.

The meaning of "workday" was not a prosecution-defined term as Defendant asserted. Rather, witnesses readily described the normal workday, as set forth in the House Caucus Policy Manual, as the hours of 8:30–4:30 or 9:00–5:00. The term did not mislead, but was properly an issue for the jury's consideration as to whether Defendant and caucus staff engaged in campaign related activities during legislative hours.

 Where evidence is relevant and admissible, the trial court commits no error in denying a motion *in limine.* The appellate courts review a ruling upon a motion *in limine* by "applying the scope of review appropriate to the particular evidentiary matter at issue, [The Superior Court] may reverse rulings on the admissibility of evidence only if it is shown that the trial court abused its discretion." *Commonwealth v. Surina,* 438 Pa.Super. 333, 337, 652 A.2d 400, 402 (1995)

The parameters of the workday were relevant to the jury's consideration of whether Defendant and caucus staff performed campaign related tasks on legislative, taxpayer-paid time. The jury was free to consider testimony and argument as to whether staff legitimately earned overtime, or utilized leave time, to perform campaign activities. Witnesses Erin Madison, Stephen Webb, Dan Wiedemer, Paul Martz, and John Jones testified that they understood "workday" or "normal working hours" to constitute the hours 9 to 5. The Defendant testified that the Personnel and Policy Manual of the House Democratic Caucus provides that employees work an eight hour day, including a lunch break, and that legislative offices may open at 8:30 or 9:00 a.m., at the discretion of the supervisor. In deciding that issue, the jury had the opportunity to consider Defendant's assertion that during various times of the year, caucus staff were required to work late into the night.

Accordingly, the court properly denied Defendant's motion *in limine.*

14. THE COURT PROPERLY DENIED DEFENDANT'S PRE-TRIAL MOTION TO DISMISS INFORMATION FOR ALLEGED PROSECUTORIAL MISCONDUCT.

Defendant first asserted this issue in his Consolidated Motion to Dismiss Criminal Complaint, Disqualify the Office of Attorney General, From Further Participation In This Case Based Upon Prosecutorial Misconduct, Appoint a Special Prosecutor and Stay All Proceedings, filed March 10,

---

**8.** Motion in Limine to Exclude Evidence That Non–Legislative Activities Occurred During a Prosecution–Defined "Normal Workday".

2004 at 343 MD 2010. The Honorable Richard A. Lewis denied Defendant's Motion by Memorandum Order filed April 19, 2010.

Defendant renewed the argument in his Omnibus Pre–Trial Motion filed February 1, 2012, which we. denied by Order filed May 31, 2012. In the instant claim on appeal, Defendant challenges the trial court's pre-trial ruling.

All of the bases of Judge Lewis' Memorandum Order of April 39, 2010 apply, namely, that dismissal of a prosecution for alleged prosecutorial misconduct prior to trial is incorrect, citing, *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (U.S.1982). Further, Defendant's allegations fail to set forth a *prima facie* claim of selective prosecution. See, *Commonwealth v. Murphy*, 795 A.2d 997 (Pa.Super.2002) and *Commonwealth v. Childress*, 799 A.2d 805 (Pa.Super.2002). We therefore we adopt the analysis of Judge Lewis' Memorandum herein as if fully set forth.

15. THE COURT PROPERLY GRANTED THE COMMONWEALTH'S MOTION IN LIMINE TO PRECLUDE EVIDENCE OF SELECTIVE PROSECUTION OR VINDICTIVE PROSECUTION.

▮ The court properly precluded Defendant from seeking to assert at trial that the prosecution engaged in the same type of conduct for which Defendant, was charged, such that the charges constituted

prosecutorial misconduct or selective prosecution. A selective or vindictive prosecution claim is not a defense on the merits and not a matter for presentation to the jury. *United States v. Armstrong*, 517 U.S. 456, 463, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) and *Commonwealth v. Butler*, 529 Pa. 7, 601 A.2d 268, 270 (1991). Accordingly, the court properly denied Defendant's pre-trial motion,

16. THE TRIAL COURT PROPERLY REFRAINED PROM DISMISSING CHARGES, WHERE DEFENDANT'S VIOLATIONS OF LAW EXCEEDED A DE MINIMUS AMOUNT UNDER 18 Pa.C.S. § 312.

▮ As set forth in detail above, the evidence supports the conclusion that Defendant's violations of theft and conflict of interest statutes resulted in misuse of taxpayer funds far in excess of a *de minimus* amount, based upon the value of staff salaries and misappropriation of taxpayer paid resources for the campaign related opposition research.

▮ While a trial court may, in the exercise of its discretion, dismiss petty or *de minimus* infractions of criminal law, dismissal of charges as petty is limited to situations where no harm was done to a victim or society, and "it is incumbent upon the trial court not to dismiss criminal conduct that is injurious to the victim or to society." *Commonwealth v. Beck*, 810 A.2d 736, 746 (Pa.Super.2002) (internal citations omitted) [9]

9. Pursuant to 18 PA.C.S. § 312:

De minimus infractions

(a) General rule—. The court shall dismiss the prosecution if, having regard to the nature of the conduct charged to constitute an offense and the nature of the attendant circumstances, it finds that the conduct of the defendant:

(1) was within the customary license or tolerance, neither expressly negative by the person whose interest was infringed nor inconsistent with the purpose of the law defining the offense;

(2) did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an

The Superior Court has upheld the trial court's exercise of discretion in refusing to deem a crime *de minimus* where the conduct the legislature sought to avoid impacted the public confidence in the election process, and involved amounts far less than those in the instant case. In *Beck,* the defendant failed to file accurate reports in violation of the Election Code. In finding no abuse of discretion in finding that the loss exceeded a *de minimus* amount, the Superior Court reasoned:

> The importance of campaign reporting requirements is obvious: by preserving public access to the manner in which campaign money is received and spent, public confidence in the election process is maintained. [The defendant's] willful refusal to comply with the registration and reporting requirements prevents verification of campaign receipts and expenses, thereby imperiling confidence in the election. This is the mischief the Legislature sought to avoid.

*Commonwealth v. Beck,* 810 A.2d 736, 746 (Pa.Cmwlth.2002)

Further, while we need not rely solely on the monetary amount of the injury in the exercise of discretion, the record supports the conclusion that Defendant's violation of theft statutes and conflict of interest amounted to significant loss to the Commonwealth as the victim.

Accordingly, no basis existed for dismissal of charges under 18 PA.C.S. § 312.

## CONCLUSION

For all of the foregoing reasons, the judgment of sentence should be affirmed.

> extent too trivial to warrant the condemnation of conviction; or
>
> (3) presents such other extenuations that it cannot reasonably be regarded as envisaged by the General Assembly or other authority in forbidding the offense.
>
> 18 PA.C.S. § 312

BY THE COURT:

 TODD A. HOOVER
/s/ PRESIDENT JUDGE