J-S70033-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| STEPHEN H. STETLER | : | No. 836 MDA 2017 |

Appeal from the PCRA Order April 19, 2017
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0003351-2010

BEFORE: GANTMAN, P.J., SHOGAN, J., and OTT, J.

MEMORANDUM BY OTT, J.: **FILED MARCH 26, 2018**

The Office of the Attorney General ("OAG") appeals from the order entered April 19, 2017, in the Dauphin County Court of Common Pleas, granting Stephen H. Stetler's petition for post-conviction collateral relief, vacating his judgment of sentence, and awarding him a new trial. On appeal, the OAG argues the PCRA court's findings, granting Stetler relief, are not supported by the record, and are legally erroneous. For the reasons below, we affirm.

The detailed facts underlying Stetler's conviction are well-known to the parties, and set forth in the PCRA court's opinion. *See* PCRA Court Opinion, 4/19/2017, at 4-15. Therefore, we need not reiterate them herein. In summary, Stetler's crimes stem from allegations of misconduct during his tenure as a Pennsylvania state legislator, specifically, for misappropriating taxpayer resources between 2004 and 2006.

On June 27, 2012, a jury convicted Stetler of six charges: conflict of interest, theft by unlawful taking, theft of services, theft by deception, theft by failure to make required disposition of funds received, and criminal conspiracy.[1] On September 25, 2012, the trial court imposed the following sentence: (1) a term of 4 to 12 months' imprisonment for the charge of conflict of interest; (2) a consecutive term of 14 to 48 months' imprisonment for the charge of theft by unlawful taking; and (3) a concurrent term of 4 to 12 months' imprisonment for the charge of conspiracy.[2] The remaining theft convictions merged for sentencing purposes. On October 9, 2012, the trial court amended the sentence for theft by unlawful taking to a term of 14 to 48 months, less one day, imprisonment.

Stetler filed a timely direct appeal, in which he raised 10 claims, challenging the sufficiency of the evidence supporting his convictions, prosecutorial misconduct, the court's decision to allow the jury to view certain evidence during deliberations, and the legality of his restitution sentence. Relevant to this appeal, Stetler also argued the trial court deprived him of his constitutional right to counsel when it answered jury questions, and reinstructed the jury on certain elements of the offenses, outside the presence of Stetler and both attorneys. *See Commonwealth v. Stetler*, 95 A.3d 864,

_____

[1] *See* 65 P.S. § 1103, and 18 Pa.C.S. §§ 3921, 3926, 3922, 3917, and 903, respectively.

[2] The court also directed Stetler to pay $466,621.45 in restitution.

868 (Pa. Super. 2014). However, the panel found the claim was waived because Stetler's attorney did not object to the procedure at the time of trial, but rather, **agreed** to allow the trial court to act "as a go-between/conduit between the jury and counsel during the jury's deliberations." *Id.* at 869. Although the panel "discern[ed] no improprieties" in the court's supplemental instructions, it stated: "If [Stetler] now perceives that trial counsel's agreement to this arrangement was ineffective, he may pursue post-conviction relief." *Id.* The panel adopted the opinion of the trial court to dispose of Stetler's remaining claims on direct appeal. *See id.* The Supreme Court subsequently denied Stetler's request for allowance of appeal. *See Commonwealth v. Stetler*, 108 A.3d 35 (Pa. 2015).

Stetler filed a timely PCRA petition on December 18, 2015, followed by two amended petitions on April 26, 2016, and January 20, 2017, respectively. In his second amended petition, Stetler raised five allegations of ineffective assistance of counsel, as well as a claim that his restitution order was illegal pursuant to **Commonwealth v. Veon**, 150 A.3d 435 (Pa. 2016).[3] The court did not conduct an evidentiary hearing, but did provide counsel the

---

[3] In **Veon**, **supra**, the Pennsylvania Supreme Court held a Commonwealth agency was not a victim, as defined under either the Crimes Code (18 Pa.C.S. § 1106(c)(1)(i)), or the Crime Victims Act (18 P.S. § 11.103), nor did the agency reimburse a victim or pay a third party on behalf of a victim. **Veon**, **supra**, 150 A.3d at 454. Accordingly, pursuant to **Veon**, "the Commonwealth cannot be a victim eligible for restitution under 18 Pa.C.S.A. § 1106." **Commonwealth v. Berry**, 167 A.3d 100, 110 (Pa. Super. 2017).

- 3 -

opportunity to argue their positions at a March 30, 2017, hearing. Thereafter, Stetler filed a motion seeking leave to amend his petition a third time, which the PCRA court denied. On April 19, 2017, the PCRA court entered a memorandum opinion and order, concluding Stetler was entitled to relief on his claim that trial counsel provided ineffective assistance when he agreed to permit the trial judge to enter the jury deliberation room and answer juror questions without the presence of Stetler or counsel. **See** PCRA Court Opinion, 4/19/2017, at 15-25. Accordingly, the court vacated Stetler's judgment of sentence, and awarded him a new trial. **See** Order, 4/19/2017. This timely appeal follows.

In its sole issue, the OAG asserts that the PCRA court's findings are not supported by the record and are legally erroneous. First, the OAG maintains this issue was raised, and rejected, on direct appeal. **See** OAG's Brief at 20-22. Accordingly, it insists the PCRA court's "apparent finding that the underlying issue had merit and the determination that [Stetler] was prejudiced were both erroneous." **Id.** at 22. Second, the OAG contends Stetler suffered no prejudice because the trial court's supplemental instructions were not erroneous, and therefore, there would have been no basis for counsel to object. **See id.** at 22-28, 29-34, 35-42. Third, the OAG maintains any error in the supplemental instructions was harmless "given the overwhelming evidence of guilt." **Id.** at 29, 35, 43. Fourth, the OAG argues the PCRA court's finding that counsel had no reasonable basis for agreeing to the procedure employed by the trial court was not supported by the record

because the PCRA court did not conduct an evidentiary hearing. **_See id._** at 22. Fifth, it insists the PCRA court's findings relate only to Stetler's convictions of theft by unlawful taking, theft of services, and criminal conspiracy. **_See id._** at 43. Therefore, the OAG concludes, "[a]t a minimum, the PCRA court's grant of relief without any basis as to [the remaining convictions of] conflict of interest, theft by deception and theft by failure to make required disposition of funds must be reversed." **_Id._**

"In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination is supported by the record and free of legal error." **_Commonwealth v. Mitchell_**, 141 A.3d 1277, 1283–1284 (Pa. 2016) (internal punctuation and citation omitted). Furthermore, a PCRA petition "may be granted without a hearing when the petition and answer show that there is no genuine issue concerning any material fact and that the defendant is entitled to relief as a matter of law." Pa.R.Crim.P. 907(2).

With regard to a claim alleging prior counsel's ineffectiveness, we are guided by the following:

> The law presumes counsel has rendered effective assistance. **_Commonwealth v. Rivera,_** 10 A.3d 1276, 1279 (Pa. Super. 2010). The burden of demonstrating ineffectiveness rests on Appellant. **_Id._** To satisfy this burden, Appellant must plead and prove by a preponderance of the evidence that: "(1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and, (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceeding would have been different." **_Commonwealth v. Fulton_**, 574 Pa. 282, 830 A.2d 567, 572 (2003). Failure to satisfy any prong of the test will result in

- 5 -

> rejection of the appellant's ineffective assistance of counsel claim. ***Commonwealth v. Jones***, 571 Pa. 112, 811 A.2d 994, 1002 (2002).

***Commonwealth v. Smith***, 167 A.3d 782, 787–788 (Pa. Super. 2017).

Here, the PCRA court determined trial counsel provided ineffective assistance when he agreed to permit the trial court to enter the jury deliberations room, and answer juror questions, without counsel present.[4] ***See*** PCRA Court Opinion, 4/19/2017, at 15. Upon our review of the record, the parties' briefs, and the relevant statutory and case law, we conclude the PCRA court thoroughly addressed and properly disposed of the OAG's claims in its April 19, 2017, memorandum opinion. ***See*** PCRA Court Opinion, 4/19/2017, at 15-25 (finding (1) although Stetler asserted a similar claim on direct appeal, "the Superior Court did not reach the question of Trial Counsel's ineffectiveness related to the agreement to allow [the trial court] to enter the deliberation room without attendance of counsel[;]"[5] (2) no evidentiary hearing was required because counsel could not have had a reasonable basis "to allow such communications, without clear establishment of the parameters thereof, well intentioned as such communications may have been[;]"[6] (3) the trial court's "explanation of the elements of Theft by Unlawful Taking and Theft

---

[4] We note the specific terms of this purported agreement were not placed on the record.

[5] PCRA Court Opinion, 4/19/2017, at 17.

[6] ***Id.*** at 19.

of Services deviated from the loosely established parameters of communication agreed upon by counsel and intermingled explanations of elements of each crime[;]"[7] and (4) the court's response to the jury's impromptu questions regarding criminal conspiracy included "hypothetical facts [which] bore a tenuous relation [to] the case under consideration and must be deemed prejudicial.").[8]  Accordingly, we rest on the PCRA court's well-reasoned bases.[9]

Furthermore we find the decision of the Pennsylvania Supreme Court in **Commonwealth v. Johnson**, 828 A.2d 1009, 1015 (Pa. 2003), instructive. In that case, the Supreme Court held a trial court committed reversible error when it provided "reiterative" jury instructions outside the presence of trial counsel.  The Court emphasized jury instructions are a "critical stage of a criminal proceeding," such that the denial of counsel is presumptively prejudicial.  **Id.**  Moreover, the **Johnson** Court found prejudice despite the fact that the trial court had simply "reiterated portions of the original instructions[,] refused to answer a juror's question[ … and a]ll interaction between the judge and jury was stenographically recorded."  **Id.** at 1013.

---

[7] **Id.** at 23.

[8] **Id.** at 25.

[9] To the extent the OAG argues those crimes for which the court did not provide further instructions may be affirmed, we disagree based on our conclusion that Stetler was denied his constitutional right to counsel at a critical stage in the criminal proceedings, thereby tainting the entire trial.

Although in the case before us, counsel purportedly agreed to the procedure employed by the trial court, we fail to see how counsel could reasonably agree to deprive Stetler of his constitutional right to counsel during a critical stage of the proceeding absent, at the very least, an on-the-record colloquy. Accordingly, we affirm the order on appeal.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/26/2018

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
: DAUPHIN COUNTY, PENNSYLVANIA

v.

STEPHEN H. STETLER : NO. CP-22-CR-0003351-2010

## MEMORANDUM OPINION
## AND ORDER

This matter comes before the Court on the Second Amended Petition of Stephen H.

Stetler ("Defendant") for Relief Pursuant to the Post Conviction Relief Act. For the reasons set

forth, we VACATE remaining aspects of Defendant's sentence and GRANT Defendant's request

for a new trial.

## PROCEDURAL HISTORY

On June 27, 2012, a jury found Defendant guilty of six felony offenses based upon allegations

of misappropriation of tax-payer funded resources during the years 2004 through 2006. Joshua

D. Lock, Esq., ("Trial Counsel") represented Defendant at trial. On September 25, 2012, the

Honorable Todd A. Hoover sentenced the Defendant to an aggregate prison term of 18-60

months, as follows:

Count 1, Conflict of Interest, 65 Pa.C.S. §1103 - Not less than 4 months nor more than 12

months incarceration, a fine of $15,000, plus the costs of prosecution;

Count 2, Theft by Unlawful Taking, 18 Pa.C.S. § 3921 - Not less than 14 months nor

more than 48 months incarceration, to run consecutively to the sentence imposed at

Count 1, a fine of $10,000, plus the costs of prosecution;

1

Count 3, Theft of Services, 18 Pa.C.S. § 3926, Count 4, Theft by Deception, 18 Pa.C.S § 3922 and Count 5, Theft by Failure to Make Required Disposition of Funds Received, 18 Pa.C.S §3927 - Merged for purpose of sentencing;

Count 6, Criminal Conspiracy (Conflict of Interest/Theft Counts) 18 Pa.C.S. §903- Not less than 4 months nor more than 12 months incarceration, to run concurrently with the previous sentences.

The sentences at Counts 1 and 2 shall run consecutively.

Restitution in the amount of $466,621.45, subject to modification.

(Transcript of Proceedings, Sentencing, September 25, 2012, p. 11).

Defendant filed a Motion for Bail Pending Appeal on October 5, 2012. The Court issued an Order on October 9, 2012 which revoked bail. On the same date, the Court issued an Amended Sentencing Order which amended the sentence at Count 2 to not less than 14 nor more than 48 months, less one day. All other aspects of the sentence remain unchanged.

On October 23, 2012, Defendant filed a timely Notice of Appeal. Barbara A. Zemlock, Esq., represented Defendant on appeal before the Pennsylvania Superior Court. The Trial Court, by the Honorable Todd A. Hoover, filed its Opinion on August 14, 2013. On June 3, 2014, the Superior Court affirmed the judgment of sentence by published opinion, *Commonwealth v. Stephen H. Stetler*, 95 A.3d 864 (Pa. Super. 2014). On August 18, 2014, the Superior Court denied Defendant's application for reconsideration/reargument. On January 22, 2015, the Pennsylvania Supreme Court denied Defendant's Petition for Allowance of Appeal.

On December 18, 2015, Defendant, by Attorney Zemlock, filed a petition under the Post-Conviction Relief Act, 42 Pa.C.S. § 9541 ("PCRA"). On December 30, 2015, this Court ordered

2

the Commonwealth to respond. The Commonwealth filed a timely response on January 21, 2016.

On April 15, 2016, Defendant filed a Motion for Leave to Amend the Petition for Post-Conviction Relief to which the Commonwealth filed a Response on April 22, 2016. Petitioner filed a First Amended Petition for Post-Conviction Relief on April 26, 2016. The Commonwealth filed a Response to the First Amended Petition for Post-Conviction Relief on May 18, 2016.

Upon the Motion of Defendant, the Court conducted a Status Conference on December 14, 2016, at which counsel addressed to potential applicability of *Commonwealth v. Veon*, to the restitution aspect of Defendant's sentence. [1] Following that conference, Defendant filed an Unopposed Motion for Leave to Amend Petition for Post-Conviction Relief. The Court granted the Motion on January 24, 2017, and directed that the Commonwealth file an Answer. On February 8, 2017, the Commonwealth filed a Response to Defendant's Second Amended Petition for Post-Conviction Relief.

On March 15, 2017, Attorney Zemlock withdrew her appearance and John C. Uhler, Esq., entered his appearance on behalf of Defendant. On March 16, 2017, Defendant filed a Reply to Commonwealth's Response to Second Amended Petition for Post-Conviction Relief.

The Court heard oral argument on March 30, 2017. Following oral argument, Defendant filed a Motion For Leave to File Third Amended Petition for Post-Conviction Relief Arising From Matters['] Absence From The Trial Record, which this Court denied by Order filed contemporaneous with this Memorandum Opinion and Order.

---

[1] 150 A.3d 453 (2016).

3

## FACTUAL BACKGROUND

The facts established at trial are as follows:

Defendant served as an elected state representative from January 1991 through July 2006, and policy chairman of the Democratic caucus (hereinafter, "caucus") between 2002 and 2006. (Transcript of Proceedings, Jury Trial, June 6-7, 2012, June 18-21, 2012 and June 25-27, 2012). (Hereinafter, "N.T."). In addition, during the years 2004 and 2005, Defendant served as operations chairman of the House Democratic Campaign Committee, the "HDCC". The HDCC is a privately funded organization dedicated to the effort to elect Democrats to office. (N.T. pp. 134-135).

The Commonwealth presented its case through the testimony of numerous caucus staff employed by the legislature under Defendant's supervision during his tenure as a state representative. The Commonwealth called Erin Madison Grace as a witness. Ms. Madison, who testified under a grant of immunity, was employed by the HDCC from 2004 through 2006. (N.T. p. 134). Ms. Madison was initially employed as a fundraiser during the time Defendant served as chairman of the HDCC. (N.T. p. 136) At the end of the campaign cycle in November or December 2004, Ms. Madison left the HDCC because of a lack of funding for her position, and began working as a research analyst for Defendant in a taxpayer-paid legislative position with the caucus. (N.T. p. 138).

At that time, Defendant served in his elected capacity as the Democratic Policy Chairman, responsible for researching and investigating issues, conducting hearings, and reporting information to the caucus. (N.T. p. 139). Ms. Madison met with Defendant, who suggested to her that she maintain her position with the privately funded HDCC, as well as accept the legislative position; that she could do both. (N.T. pp. 144-145). Ms. Madison testified that from late 2004

4

to summer 2006, she worked for Defendant in his legislative office at the House Democratic caucus as a research analyst. She assisted in researching issues, contacting individuals to speak about policy issues and writing papers on specific issues. *Id.* Ms. Madison testified that Kevin Sidell and PJ Lavelle, who worked for State Representatives William DeWeese and Representative Michael Veon in taxpayer paid positions, taught her how to utilize PT Database, a software program used to research and track donor contributions to the HDCC. (N.T. pp. 140-141). While she worked on Defendant's legislative staff, she tracked lists of past donors, called potential donors, and confirmed meetings. (N.T. pp. 144-145). Ms. Madison also coordinated events, created invitations, collected donation checks, and scheduled meetings with potential donors, all campaign-related activities. (N.T. p. 146).

In both the HDCC position and on Defendant's legislative staff, Ms. Madison performed the campaign related fundraising for the HDCC and Defendant, as an individual candidate. (N.T. p. 147). Ms. Madison scheduled blocks of time for Defendant to place fundraising phone calls, which usually took place in Defendant's office in his State House office at the Capitol, typically between 9 am and 5 pm, which Ms. Madison described as her normal working hours. (N.T. p. 148). Ms. Madison testified that prior to a scheduled phone call, she prepared a spreadsheet which included a list of potential donors, or past donors, along with contact information and the history of donations. (N.T. pp. 150-151).

In both the HDCC position and the legislative position, Defendant served in a supervisory position over Ms. Madison. (N.T. p. 152). Ms. Madison estimated that during 2005, she spent an average of 50 percent or more of her time during the 9 to 5 workday performing fundraising activities such as maintenance of the database and processing donations. (N.T. p. 153). Also during the summer of 2005, while a member of Defendant's legislative staff, Ms. Madison

assisted with campaign work in a special election of particular interest to the Democratic party, the Minger/Byer race, House District 131, having been copied on an email from Defendant inquiring as to when legislative staff would be sent out in the field to support the race. (N.T. pp-. 154-156; N.T. pp. 174-175). Ms. Madison estimated that cumulatively, she worked several weeks, to months, on that election. (N.T. p. 200).

Ms. Madison testified that she understood fundraising and volunteering to be a part of her job, and important to career advancement. (N.T. pp. 159-160). She testified that the culture of the caucus was such that the more one volunteered for campaign work, the more likely their career would advance and they would receive bonuses, paid from taxpayer funds. (N.T. pp. 160-161). Ms. Madison earned $34,000 in 2004, $36,270 in 2005, of which $1065 was a bonus, and $48,022 in 2006.

For some of the campaign work performed during the workday, Ms. Madison used compensatory time ("comp" time), leave accumulated by working beyond the set business hours. She testified that normal work hours, according to the personnel manual, were 40 hour per week, 8:30 a.m. to 4:30 p.m. or 9 a.m. to 5 p.m. (N.T. p. 167; N.T. p. 226).

Using comp time enabled her to perform political work during the regular workday, for which she was paid. Ms. Madison testified that, when discussing the position, Defendant told her she would continue to do campaign fundraising, and he encouraged her to begin accumulating comp time as soon as she started working, so that it could be used for political work. (N.T. pp. 165-166). Ms. Madison testified that after 5 pm, she often worked on the PT Databases, or didn't work, but sent emails and talked to co-workers, or stayed late when she did not have any responsibilities. (N.T. p. 167; N.T. p. 197-198). The comp time was earned, in part, from workday hours in which she performed campaign activities, such that she was earning comp time

6

for non-legislative work. (N.T. pp. 166-169). She testified that Defendant made it clear that she was to use earned comp time to account for periods she performed political activity. (N.T. p. 213).

The majority of fundraising work Ms. Madison performed as a caucus employee was for the Defendant. (N.T. p. 168). However, Ms. Madison did some fundraising for HDCC, as such fundraising benefited other candidates and engendered influence and goodwill. (N.T. p. 170).

The Commonwealth also called Stephen Webb as a witness. Mr. Webb began working for the caucus research office, a publicly paid position, in July 2003. (N.T. p. 276). In 2004 and in 2006, Mr. Webb performed opposition research, which entailed search of information which could be negative to the campaign of an opponent or one's own candidate. (N.T. p. 280). Opposition research was campaign work, not legislative work. (N.T. pp. 286-287).

Mr. Webb and other caucus employees attended a meeting in 2004 in Defendant's office during business hours. Email communications copied to Defendant reflect discussion of the 2004 opposition research meeting. (N.T. p. 295; Exhibit 22). The email attached a form which was to be filled out for time spent on opposition research. At that meeting, Defendant stressed the importance of opposition research to the party, and asked for discretion in performing the work, since it related to campaign, rather than legislative, work. *Id.* In a June 8, 2004 email Defendant inquired of Michael Veon whether Stephen Webb would remain on the caucus payroll and work out of House District 16 office, approaching a general election for a vacant seat sought by Democratic candidate Sean Ramaley. (N.T. p. 298; Exhibit 27). The email does not reflect a response. (N.T. p. 374)

7

Mr. Webb testified that the amount of opposition research performed in the caucus increased dramatically from 2004 to 2006 because of the effort to regain a majority in the legislature. (N.T. p. 287).

The Commonwealth also called Dan Wiedemer as a witness. Mr. Wiedemer served as the full time, paid Executive Director of the HDCC from May 2003 to January 2007. (N.T. p. 386). As Executive Director, Mr. Wiedemer oversaw the campaigns of candidates for the state legislature, developed fundraising plans, and hired consultants for commercials and polling. (N.T. pp. 387-388). Defendant was chairman of the HDCC, and Mr. Wiedemer's supervisor. (N.T. pp. 398-399). The HDCC hired Erin Madison as political fundraiser in April or May of 2004 (N.T. pp. 388-389; N.T. p. 391). Ms. Madison moved to the House caucus in November 2004, to work for Defendant. However, she continued to conduct fundraising for the HDCC even while employed by the Commonwealth. (N.T. p. 393). A large percentage of discussions regarding fundraising between Ms. Madison, and Wiedemer, as Executive Director of the HDCC, occurred during the Commonwealth's legislative workday, between 9 am and 5 pm. (N.T. p. 395; N.T. p. 489).

Wiedemer testified that for the 2004 and 2006 campaign cycles, legislative caucus employees performed opposition research. (N.T. p. 401). The HDCC paid employees' expenses, such as mileage and copying, but did not pay their salaries, as the HDCC did not have the funds to do so. *Id.* The HDCC also did not have funds for use of the legal research search engine, LexisNexis, and utilized the account of the House Caucus. (N.T. p. 403).

Wiedemer testified that as a result of an election loss attributed to ineffective opposition research, the HDCC began looking into hiring outside companies to perform opposition research. (N.T. p. 407). Wiedemer spoke to Defendant about the proposal, and the cost to utilize outside firms. Wiedemer learned that firms specializing in opposition research charged $2,500 to $5,000,

8

plus travel expenses, per race. (N.T. pp. 408-409). As HDCC Chair, Defendant decided that use of outside firms was too expensive, and that the HDCC should continue to use legislative staff for that function. (N.T. pp. 411-412).

Ongoing email communications during the workday among Representative Mike Veon, Erin Madison, and Representative Myers dated April 27, 2005 reflect discussion of utilizing taxpayer paid staff for training Myers' district office staff on fundraising. (N.T. pp. 413-416; Commonwealth Exhibit 60). Defendant responded, and expressed nervousness about Erin Madison calling district staff about fundraising. *Id.*

Further emails reflect communications by and to Defendant regarding opposition research reports performed by taxpayer-paid caucus employees. (N.T. pp. 420- 426; Exhibit 40). In one such communication, Defendant provided a copy of an opposition research report, inquired about lodging for a staffer working on an election, and indicated "We will be paying [the] salary of [that] person through election." (N.T. p. 427). In a May 25, 2006 series of emails, Defendant requested that his name be added to the list of persons who would be provided the results of opposition research provided by taxpayer-paid caucus staffers. (N.T. pp. 430-432).

Although contributions on behalf of Defendant to HDCC campaign funds raised for 2004 totaled $82,000, those funds were not utilized for opposition research. (N.T. p. 497; Commonwealth Exhibit 56).

The Commonwealth also called as a witness Jessica Walls-Lavelle ("Ms. Walls"). Ms. Walls worked as Political Director of the HDCC for a short period during 2002, then later, from October 2003 to February 2007. (N.T. p. 506). During the second period of her employment, Defendant served as head of the HDCC and an elected representative. (N.T. p. 508). Although Ms. Madison had left the role of HDCC as Finance Director and began working with Defendant

9

in his elected capacity, Ms. Walls continued to address fundraising and finance questions with Ms. Madison. (N.T. pp. 508-509). Most of those communications occurred during the workday. (N.T. p. 510).

In 2005, Ms. Walls and Dan Wiedemer spoke about hiring an outside firm, paid for by the HDCC, to perform opposition research, at a cost of three to five thousand dollars per race. (N.T. pp. 512-513). Ms. Walls testified that the proposal was "pretty much shot down" by Defendant. (N.T. p. 513).

Paul Martz, a research analyst with the legislative House Democratic Caucus office of Member Services, testified that during 2004, he participated in opposition research, which he conducted at his office located in the Capitol. (N.T. pp. 520-524). By 2006, he had access to LexisNexis, a large database, also utilized from his office on the Capitol building. (N.T. p. 525). With the exception of one report, which he wrote at home, he prepared most opposition research reports at his desk in the Capitol during the normal workday. (N.T. p. 527). Mr. Martz used the term "normal work day" to refer to the hours of 9 am to 5 pm.

In 2004, members of the caucus staff in taxpayer-paid positions performed extensive opposition research in important races. (N.T. pp. 528-529). During the 2004 and 2006 election cycles, the intensity of the focus on opposition research and the utilization of caucus staff increased. (N.T. pp. 529-531). During 2006, Mr. Martz spent the majority of his work time on campaign related matters. (N.T. p. 532). Mr. Martz testified that the comp time he did submit was not legitimately earned. (N.T. p. 533). Mr. Martz' boss, Eric Webb, told Martz and other caucus employees that they could stay after hours to earn comp time to campaign, even if they did not have extra caucus duties to perform. (N.T. pp. 533-534). Payment for the comp time utilized came from the budget of the taxpayer-funded House Democratic Caucus. (N.T. p. 534).

Martz testified that Defendant did not encourage him to build up comp time, nor did he report the accumulation of time to Defendant. (N.T. p. 548). While never ordered to so, Martz was encouraged by Eric Webb to build comp time. (N.T. p. 533; p. 556).

Martz attended a meeting in Defendant's office in the Capitol building in 2006 which included Dan Wiedemer, Defendant and another representative to discuss the write-in effort of Chelsa Wagner, a Democrat in Pittsburgh. (N.T. p. 535). The meeting occurred during the normal workday. (N.T. p. 536).

Commonwealth Exhibit 107 reflects Mr. Martz' salary for the years 2004, 2005 and 2006. (N.T. p. 538). Mr. Martz earned a total salary of $126,620 for those three years. Mr. Martz testified that approximately seventy percent of his work related to campaign matters. (N.T. p. 539).

Eric Webb also testified. Mr. Webb was employed by the legislative House Democratic Caucus from 1997 through 2007. Mr. Webb became Director of the Office of Member Services in 2005. (N.T. p. 561). During that time, staff of the Office of Member Services, although paid by taxpayer funds, performed campaign work and a majority of the opposition research. (N.T. p. 562).

In 2004, Defendant emailed Webb and thanked him for his service to the caucus in performing opposition research. (N.T. p. 570).

In the 2006 election cycle, Webb participated in meetings with Defendant and Michael Manzo, chief of staff for Representative William DeWeese, to discuss access to the database, LexisNexis, specifically for opposition research, at Defendant's office in the Capitol building. (N.T. pp. 565-566; N.T. p. 622). At that time, Defendant served as Policy Committee Chairman, a leadership position in the caucus. (N.T. p. 566). At the meeting, Defendant raised no objection

11

to the use of LexisNexis, a legislative resource. (N.T. p. 568). Following the meeting with Defendant and Manzo, more LexisNexis passwords became available for opposition research. (N.T. p. 588; N.T. p. 591). Prior to that meeting, no one in Webb's office had a password. (N.T. p. 608).

The Commonwealth called John Jones as a witness, who also testified under immunity. (N.T. p. 740). Mr. Jones began working at the House Democratic Caucus in the research office as a paid intern in 1998. (N.T. pp. 616-617). After graduating from college, Mr. Jones worked as a research analyst in Defendant's office at the Capitol. (N.T. p. 617). In 2004, upon returning to Defendant's office, after a one year departure to the private sector, Mr. Jones performed Defendant's personal legislative work, and an increasing amount of political work overall. (N.T. p. 619). In August 2004, Mr. Jones, along with caucus employees Eric Webb and Renee Diehl were requested to attend a meeting with Mike Manzo, and asked to go to work at the House Democratic Campaign Committee for the remaining time before the election, to assist with mailings on behalf of incumbents. (N.T. pp. 619-620; N.T. p. 622). Those individuals would remain as caucus employees, and account for the time with leave slips. (N.T. p. 620). Manzo told them he would increase their leave time if they did not have enough to cover the time spent at the HDCC. (N.T. p. 621). Jones testified that the arrangement, as presented by Manzo, could not have taken place without Defendant's approval. (N.T. p. 622). Jones believed Defendant's approval was implied in that Jones did not work at the caucus for a few months, and yet Defendant did not question his absence. (N.T. p. 742).

From August 2004 through November 2004, Jones worked full time for the HDCC, although the legislature paid his salary. (N.T. p. 624). Mr. Jones had daily contact with Defendant, and spent 99.9 percent of his time on campaign work. (N.T. p. 627). Jones testified that the comp

12

time he used was not legitimately earned. For example, he built comp time for hours he worked on political rather than legislative matters. (N.T. pp. 628-629). Jones was sensitive to the appearance of working on campaign matters outside of the office, such as opposition research in a county courthouse, and for those assignments, was more likely to turn in a time slip. (N.T. p 629).

Jones testified that after the 2004 election cycle, Erin Madison joined Defendant's legislative office, but continued to perform fundraising for the HDCC and Defendant individually. (N.T. p. 657).

Also after the 2004 election cycle, Jones met with Dan Wiedemer, and presented a plan to Defendant to increase the amount of caucus resources through the Office of Member Services for campaign use. Defendant participated in those discussions. (N.T. p. 633). During the 2005 primary, Jones worked in Pittsburgh, and in Allentown, on the Minger/Byer race, for approximately 35 days, of which Defendant was aware. (N.T. p. 635).

In August or September, 2005, at Defendant's request, Jones assisted with campaign efforts of York mayoral candidate John Brenner. (N.T. pp. 638-640). Defendant was involved in economic development projects in that area. Jones conducted the Brenner campaign work from Defendant's district office in York, including entering data at his computer at the district office, between the hours of 9 to 5. (N.T. p. 641; N.T. p. 644). During that time, Jones remained a full time caucus employee, although he spent approximately 75 percent of his time on campaign work. (N.T. p. 642; N.T. p. 647).

In 2006, Mr. Jones performed campaign work and opposition research for Defendant's re-election. (N.T. pp. 650-651). Also in 2006, Jones discussed with Defendant and Michael Manzo, in Defendant's office in the Capitol, utilizing legislative staff for critical primaries, and awarding

13

credit for that work, for evaluation of career advancement, pay increases and bonuses. (N.T. pp. 652-654). An e-mail dated April 27, 2006, to Wiedemer, Defendant, Manzo, Jones and others, confirmed the plan that credit would be awarded for races, as determined, in part, by the HDCC. (N.T. p. 633; Commonwealth Exhibit 81). In addition, an e-mail from Defendant to Jones, and others, further discussed the issue of credit awarded for particular races, and included an attachment of an opposition research report. (N.T. pp. 663-664; Commonwealth Exhibit 89). In an e-mail dated Monday, June 19, 2006, at 2:17 in the afternoon, Jones provided Defendant and others with an opposition research report. (N.T. p. 665; Commonwealth Exhibit 91).

For campaign work performed in 2006, including opposition research, petitions, and attending elections, Jones submitted a small amount of comp time, usually for the most publicly visible work. (N.T. pp. 655-656). During 2006, Jones spent, estimating conservatively, 25 percent of his time on campaign work, although he could have spent as much as 35 to 40 percent. (N.T. p. 667). He received no salary from HDCC for the period of 2004-2006 for campaign work performed. (N.T. p. 666). Commonwealth Exhibit 105 reflects the highest salaries Jones earned for the years 2004, 2005 and 2006, as well as bonuses awarded by the caucus. Commonwealth Exhibit 102 reflects the salaries of House Democratic Caucus members.

Defendant testified that the Personnel and Policy Manual of the House Democratic Caucus provides that employees work an eight hour workday, including a lunch break, and that legislative offices may open at either 8:30 or 9:00 a.m., at the discretion of the supervisor. (N.T. p. 789; p. 879). Defendant testified that he focused on the separation between legislative and campaign work, and imparted that to his caucus staff. (N.T. p. 884).

The defense called as witnesses members of Defendant's legislative staff, some of whom worked at Defendant's office in the Capitol, others at his district office in York. Those witnesses

14

testified that Defendant instructed them to keep legislative and campaign activities separate, and to use leave time for volunteer campaign activities. (N.T. pp. 896-932). Rosemary Green, the secretary and office manager of Defendant's legislative office, testified that legislative and campaign work were commingled throughout the course of the day. (N.T. p. 968).

The defense also called Cameron Texter. Mr. Texter began working for the House Democratic Caucus in 1990, and remained so employed as of the time of trial. (N.T. p. 972). In 2004, Texter worked at the Office of Member Services, ("OMS"). In 2004, he prepared opposition research reports, primarily on his own time. (N.T. p. 973). In 2005, Eric Webb took over as head of OMS. After Eric Webb took over in January 2005, political and opposition research comprised 80 percent of Texter's work. (N.T. pp. 973-974). Representative Veon instructed Texter that he was required to forward copies of opposition research reports to Defendant, which he did. (N.T. p. 978; N.T. p. 998-999). Defendant would receive a copy through his legislative e-mail or his Blackberry. (N.T. p. 981).


DISCUSSION

Although the claim of *per se* denial of the right to counsel has been fully litigated, Defendant's PCRA claims related to Trial Counsel's agreement to the Trial Court's entry to the deliberation room to respond to jurors' questions are properly before this Court. We find that Defendant received ineffective assistance of counsel related to Trial Counsel's agreement, that prejudice resulted and therefore, Defendant is entitled to relief.

Upon direct appeal the Superior Court reviewed Defendant's assertion that:

> [w]here the Trial Court met with the jury outside the presence of [Appellant] and counsel and answered questions which pertained to the court's charge and the elements of the offense , was [Appellant] deprived of his right to counsel and to a fair trial in violation of his rights under the sixth and fourteenth amendments of the United States

15

Constitution and Article [1], Section 9 of the Constitution of the Commonwealth as well as Pa.R. Crim.P. 647 (C)?

*Commonwealth v. Stephen H. Stetler*, 95 A.3d 864, (Pa. Super. 2014)

Here, because Trial Counsel agreed to the Trial Court's addressing jurors' questions outside his presence, the Superior Court rejected Defendant's reliance upon *Commonwealth v. Johnson*, 574 Pa. 5, 13, 828 A.2d 1009 (2003), where no such agreement existed. The Superior Court reasoned,

> We further note that Appellant's reliance upon *Johnson*, supra, is inapposite, since in *Johnson*, no such agreement existed and trial counsel specifically requested the defendant be present for any additional instructions on the record. See, *Johnson*, 828 A.2d at 1011 (citing trial counsel's statement "just for the record, we would ask that there not be a charge to the jury, or anything happen without counsel or the client being here.")

*Commonwealth v. Stephen H. Stetler*, 95 A.3d 864, 868 (Pa. Super. 2014)

In the instant Second Amended Petition for Post Conviction Relief, Defendant again relies upon *Johnson* for the claim that Defendant was deprived of Sixth and Fourteen Amendment rights as a matter of law. (*See*, Second Amended Petition for Post Conviction Relief, para 48. "As a matter of law, Petitioner was prejudiced by this process").

Defendant's claim of *per se* denial of constitutional rights irrespective of the conduct of Trial Counsel has been previously litigated. An issue has been previously litigated if the "highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue; or . . . it has been raised and decided in a proceeding collaterally attacking the conviction or sentence." 42 Pa.C.S. §9544(a). Issues litigated on direct appeal cannot be raised in a post-conviction proceeding by re-styling the claim as one of ineffectiveness of counsel. See, *Commonwealth v. Hutchins*, 760 A.2d 50 (Super. Ct. 2000) citing *Commonwealth v. Morales*, 549 PA. 400, 410, 701 A.2d 516, 521 (1997).

16

In order to determine which other of Defendant's PCRA claims have been fully litigated, we look to the Superior Court's conclusion that "the Honorable Todd A. Hoover thoroughly discussed each issue raised, cited applicable legal principles and correctly rejected each claim." *See, Commonwealth v. Stephen H. Stetler*, 95 A. 3d 864, 869 (Pa. Super. 2014). The Superior Court deemed Defendant's "citation to parts of the record to advance his claim to be 'a self–serving reading of Judge Hoover's comments to the jury' and that it "[discerned] no improprieties in Judge Hoover's instructions to the jury..." *Id.* The Superior Court also deemed Defendant's objection to the Trial Court's charge and responses to questions in the jury room waived for purposes of direct appeal and concluded, "[if Defendant] now perceives that trial counsel's agreement to this arrangement was ineffective, he may pursue post-conviction relief." *Id.*

However, because the Superior Court did not reach the question of Trial Counsel's ineffectiveness related to the agreement to allow Judge Hoover to enter the deliberation room without attendance of counsel, we must now review those claims as they are articulated in Defendant's Second Amended Petition for Post Conviction Relief.

In order to demonstrate entitlement to post-conviction relief, the petitioner must establish that:

> There is merit to the underlying claim; (2) that counsel had no reasonable basis for his or her conduct; and (3) that petitioner was prejudiced by counsel's performance, that is, that there is a reasonable probability that, but for the act or omission challenged, the outcome of the proceeding would have been different.

42 Pa. C.S. §§ 9541-9546. *See, Commonwealth v. Ali*, 10 A.3d 282, 291 (Pa. 2010).

Our Supreme Court has explained,

> A PCRA petitioner will be granted relief only when he proves by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the trust - determining process that no reliable adjudication of guilt or innocence could have taken place. 42Pa. C.S. § 9543(a)(2(ii). Generally, counsel's performance is presumed to be

17

constitutionally adequate, and counsel will be deemed ineffective only upon a sufficient showing by the petitioner.

*Commonwealth v. Johnson*, 600 Pa. 329, 346, 966 A.2d 523, 532 (2009)(*internal citations omitted*)

Pursuant to *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed 2d 674 (1084), to obtain relief, a petitioner must demonstrate that counsel's performance was deficient and that the deficiency prejudiced the petitioner. A petitioner establishes prejudice when he demonstrates that "there is a reasonable possibility that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Johnson, Id.*, citing *Strickland*, 694, 104 S.Ct. 2050; *See also Commonwealth v. Mallory*, 596 Pa. 172, 941 A.2d 686, 702-04 (2008), *cert. denied.* __U.S.__, 129 S.Ct. 257, 172 L.Ed. 2d 146 (2008). "A reasonable probability is that there is a probability sufficient to undermine confidence in the outcome." *Strickland*, 694, 104 S.Ct. 2050.

In undertaking this analysis, at the outset, we correct PCRA Counsel's characterization of Judge Hoover's statements in the jury deliberation room as *ex parte*. Such characterization improperly suggests that Judge Hoover met with the jury without the knowledge of counsel and without a record. Neither is correct. Both counsel acquiesced to Judge Hoover's entry into the deliberation room to respond to inquiries on the record.

We also find it necessary to comment upon the suggestions, presented in oral argument and in Defendant's Motion to for Leave to File Third Amended PCRA, that Judge Hoover engaged in some sort of improper or prejudicial communication with a juror based upon an on -the-record reference to "Poptarts" and "fish in the Susquehanna". (Motion for Leave to File Third Amended Petition for Post Conviction Relief Proceeding Arising from Matter [s'] Absence From The Trial Record, Exhibit A, para. 192). This Court takes great umbrage in any suggestion that the

18

innocuous remark indicates any improper contact between the late Judge Hoover and a juror or withholding of matters of record. Judge Hoover was a man of honor and integrity. Unfortunately, PCRA Counsel has mistaken his kind nature, warmth and friendliness in addressing the jurors with some other motive. We find PCRA Counsel's suggestion that Judge Hoover's conduct was unethical to be offensive and an overly zealous attempt to reach a positive outcome for his client.

As to whether Trial Counsel had a reasonable basis for acquiescence to Judge Hoover's addressing the jury outside his presence, we do not require an evidentiary hearing. Without hesitation, we conclude that both Trial Counsel's *and* Commonwealth Counsel's agreement to allow such communication speaks only to the great respect, admiration and trust placed in Judge Hoover.

However, we are constrained to conclude that for Trial Counsel to allow such communications, without clear establishment of the parameters thereof, well intentioned as such communications may have been, lacked a reasonable basis and resulted in prejudice.

### Deliberation Room Visit 2.

At the conclusion of the day on which the Court provided the charge to the jury, with the permission of counsel, Judge Hoover entered the jury deliberation room, excused the alternates and provided brief instruction that, upon their return the following day, the jury should write down and bring to the Court's attention questions as to the availability of exhibits and legal instructions. (N.T. pp. 1156-1157).

The record reflects that on June 26, 2012 at 10:18 a.m., following an in-chambers conference with counsel and again with their permission, Judge Hoover entered the jury deliberation room. Judge Hoover's statements to the jurors reflect that the Court and counsel had established the parameter of the visit as answering questions regarding exhibits which could be provided to the

19

jury. Judge Hoover stated, "We're in the deliberation room with permission of counsel. We just met with Mr. Lock and the AG's office to answer the questions and the request for exhibits." (N.T. p. 1162).

Unfortunately, in the *sincere* effort to fully and fairly answer jurors' questions, Judge Hoover digressed from the response to a request for exhibits to questions regarding statutory elements of the charges. A juror asked, "What about explaining a few terms, intent, moveable property and compensation, things like that?" (N.T. p. 1166). Judge Hoover responded that he told counsel he would return to chambers if the jury had additional questions. (N.T. p. 1167). A juror persisted, stating, "We do have a new list of just some more questions. Sorry." *Id.*

In an obvious effort to provide guidance, Judge Hoover proceeded with additional explanation of the definitions for the term moveable property and elements of the Theft by Unlawful Taking and Theft of Services statutes. The following occurred:

JUROR: Did you put moveable property down too?

THE COURT: Moveable property is just money, the public funds. That's all that is.

JUROR: So it can't be anything other than money?

THE COURT: Well, for the theft statute, I think the first—I want to look at my charge again, but the theft by unlawful taking is you took moveable property which was—could be taxpayers' funds and that's what it was.

For the next one I think was some theft of services, which would not be moveable property. It was the campaigning time, the use of computers and things like that. Those were the services for legislative purposes.

Again, you heard the testimony. If they were used for non-legislative purposes, that was the theft of services because they were to be services, legislative things, that's that kind of thing.

No one really moved physical--like the computer didn't get moved. That theft, moveable property, funds, money is moveable property.

JUROR: Does that include employees, like their salary-wise and stuff like that?

THE COURT: Absolutely, yes.

JUROR: Because that was one of our questions.

THE COURT: Because that was the moveable property used to pay. Yes.

JUROR: Compensation, I don't know if you added that, compensation. This one is very vague to me, the Defendant knew the services were available only for compensation.

THE COURT: They were available if they used campaign funds. That's what—in other words, those funds were not used for—the legislative funds that paid folks to go do campaigning, the defendant knew that was wrong. That's the bottom—knew that they were available for the compensation that they were supposed to come from. That's what it is. That's that element.

(N.T. pp. 1167-1169).

As to the statutory elements of each, Theft by Unlawful Taking, 18 Pa.C.S. § 3921 provides that "[a] person is guilty of theft if he takes, or exercises control over, moveable property of another with intent to deprive him thereof."

In the courtroom, the jury received instruction on the charge of Theft by Unlawful Taking as follows:

The first one is that the Defendant, his accomplice or conspirator took or exercised control over moveable property. Moveable property in this case is those public funds.

21

Money is moveable property. So those funds were used for nonlegislative purposes. That's no. 1. The Commonwealth has to establish that.

No. 2, the moveable property in this case, the public funds, definition of moveable property is any property, the location of which can be change. That's No. 2, that they establish that.

No. 3, that the taking or the exercising control over those public funds, was unlawful, that it was used for nonlegislative purposes. You've already heard about that.

No. 4, that the taking or exercise of control over those funds was with the intent to deprive the public of the legitimate use of those taxpayers' funds for legislative purposes.

So those are the four elements that the Commonwealth has to establish in order to find the Defendant guilty.

(N.T. pp. 1139-1140).

As to the charge of Theft of Services, 18 Pa. C.S. §3926, the statute provides, in relevant part,

(a) Acquisition of services.-
(1) A person is guilty of theft if he intentionally obtains services for himself or for another which he knows are available only for compensation by deception or threat...
(b) Diversion of services.- A person is guilty of theft if, having control over the disposition of services to others to which he is entitled, he knowingly diverts such services to his own benefit or another not entitled thereto.

Theft of Services, 18 Pa. C.S. §3926.

In the courtroom, the jury received instruction as follows on the charge of Theft of Services as follows:

The elements for theft of services, that is-- again this is intentional conduct, that the Defendant, accomplice or conspirator obtained services, in this case alleged use of public funds or services, for himself or another.

And specifically in this case that would be the personnel time, the services, use of the computer for those nonlegislative purposes. That's No. 1.

No. 2, the Defendant, accomplice, co-conspirator, obtained the services intentionally. We've gone over that before. The Defendant knew that the services were available only for compensation. In other words, that when you used the public funds to do

22

nonlegislative activity, that those funds should have been paid for through campaign-related funds.

So that's what it is, that the Defendant knew the services were available only for compensation. So that's what the third element involves. They took the public funds and used them for nonpublic use. Again, that's the savings that were talked about in the evidence.

Finally, the Defendant again obtained the services to avoid payment for services using campaign funds.

(N.T. p. 1141-1142).

In the deliberation room, Judge Hoover endeavored to place these complex legal principles into a factual context and relate them to the instructions previously delivered. It is well recognized that "the trial court may use its own form of expression to explain difficult legal concepts to the jury as long as the trial court's instruction accurately conveys the law." *Commonwealth v. Cook*, 952 A.2d 594, 626-627 (Pa. 2008). However, the additional instructions were unclear. Judge Hoover's explanation of the elements of Theft by Unlawful Taking and Theft of Services deviated from the loosely established parameters of communication agreed upon by counsel and intermingled explanations of elements of each crime.

Although Judge Hoover correctly explained that Theft by Unlawful Taking included the statutory element of moveable property, Judge Hoover's ensuing explanation suggested that Theft of Services also included the element of moveable property which element was satisfied by the fact that the salaries of legislative employees also constituted moveable property. In explaining Theft of Services, Judge Hoover stated, "No one really moved physical--like the computer didn't get moved. That theft, moveable property, funds, money is moveable property. " (N.T. p. 1168).

Also, Judge Hoover's explanations of facts in relation to the charges of Theft by Unlawful Taking and Theft of Services were phrased in such a way that the jury could have deemed such

23

facts conclusively determined. (N.T. pp. 1167-1169). Therefore, the absence of Trial Counsel during the explanations created prejudice.

### Deliberation Room Visit 3.

Following the discussions addressed above, Judge Hoover returned to chambers and apprised counsel that jurors requested instruction on knowing and intentional conduct, and the Theft of Services charge. (N.T. pp. 1170-1172). Without objection, Judge Hoover related that he would re-instruct the jury regarding knowing and intentional conduct with the instruction provided in open court. (N.T. p. 1174). Judge Hoover stated that he would provide that re-instruction and nothing more. *Id.* Neither counsel requested that the jury be brought to the courtroom for the re-instruction.

In the deliberation room, Judge Hoover correctly instructed jurors that they must rely upon their own recollections to make factual determinations regarding exhibits. (N.T. pp. 1177-1178). Judge Hoover also properly re-instructed on the definition of intentional conduct. (N.T. pp. 1179-1180).

Again in an effort to provide additional explanation the jury sought, Judge Hoover deviated from the parameters outlined with counsel and entertained additional questions regarding elements of charges. In doing so, Judge Hoover digressed to responses as to whether criminal culpability attaches based upon a person's mere knowledge of a crime. (N.T. pp. 1181-1183). Judge Hoover provided hypothetical examples of culpability for conspiracy to commit bank robbery based upon varying levels of a person's actions and knowledge and correctly stated that mere knowledge of a crime is not criminal conduct. (N.T. p. 1184). However, Judge Hoover's response to the inquiry as to whether one who benefits after the commission of a crime by another is criminally liable was unclear. *Id.*

24

Such discussion of hypothetical facts bore a tenuous relation the case under consideration and must be deemed prejudicial.

CONCLUSION

The agreement of two highly skilled and experienced counsel to Judge Hoover's entry into the jury deliberation room to address jurors' questions outside their presence demonstrates the great trust and confidence counsel placed in Judge Hoover. Although error occurred, the record reflects only a sincere effort by Judge Hoover to properly instruct the jury.

The responses provided in the jury room deviated from the vaguely established limits of discussion addressed with counsel and included error and prejudicial reference to facts. Without Trial Counsel present and absent a request for the transcript, ineffectiveness occurred sufficient to undermine confidence in the verdict.

Because we grant relief based upon the above Discussion, we need not reach the remaining claims in Defendant's Second Amended Petition for Post Conviction Relief.

For all of the foregoing reasons, we enter the following: